INDIANA NOVELTY MFG. CO. v. CROCKER CHAIR CO.

(Circuit Court of Appeals, Seventh Circuit. June 18, 1900.)

No. 630.

PATENTS—PATENTABLE NOVELTY—BICYCLE WHEELS.

The Marble patent, No. 547,732, for a wooden-rim bicycle wheel, which differs from similar wheels previously made only in making a tongued and grooved joint between the ends of the wooden rim, where they meet, is void for want of patentable novelty, and anticipation in the prior art of joinery.

Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

The decree of the Circuit Court for the Eastern District of Wisconsin appealed from is one dismissing for want of equity a bill to enjoin the appellee from infringing Letters Patent No. 547,732, dated October 8, 1895, issued to George W. Marble for a wooden-rim bicycle wheel; and Letters Patent No. 506,430, dated October 10, 1893, issued to Charles F. Harrington for a wheel.   90 Fed. 488.

The Circuit Court found that both patents had been anticipated in the prior art, and were, therefore, invalid.   On the hearing of the case in this court counsel for the appellant announced that in the prosecution of the appeal they placed no reliance upon the validity of the Harrington patent; and thereupon the appeal was argued solely upon the alleged error of the Circuit Court in holding the Marble patent to be invalid.

The effective portion of Letters Patent No. 547,732, (the Marble patent), is as follows:

"My invention relates to improvements in bicycle wheels, and to that particular class of bicycle wheels having wooden rims.   Heretofore wooden rims for bicycle wheels have usually been made from a continuous or single strip of wood curved into the proper circular form and having its meeting ends skived off at an angle and overlapped, forming an ordinary lap-joint, secured together by glue and sometimes by wrapping with thread or fabric, or else the wooden rims have been built up of a number of thin strips glued upon one another. Owing to the necessary curved cross-section of the rim to form the annular channel to receive the tire serious objections have been found in practice to the composite or built-up rim composed of a series of thin strips, and as the bicycle wheel is of the tension-spoke character, so that its strength and stiffness depend upon the rigidity of the continuous or circular arch formed by the rim of the wheel, it is obvious that where the wooden rim is made of a single solid strip of wood with its meeting ends skived off and lapped together the whole strain or tension of the wheel must necessarily come upon this lap-joint and tend to loosen the same and destroy the wheel or cause the two skived and lapped parts to slip toward each other.

"The object of my invention is to provide a wooden rim bicycle wheel wherein the rim may be made of a single solid strip of wood, and which will be of a strong and efficient as well as simple and cheap construction, and wherein the joint at the meeting ends of the solid strip will not tend to weaken or diminish the natural strength of the circular arch, and wherein, also, the tension and strain of the wheel upon the arch will not tend to loosen or weaken the joint forward between the two or more meeting ends of the strip.

"To this end my invention consists in a bicycle wheel having a wooden rim composed of one or more solid strips of wood, and preferably a single solid strip, and having its or their meeting ends joined together by a series of interlocking tongues and grooves extending longitudinally of the strip or strips. The meeting ends of the strip thus abut squarely together end to end, so that the arch of the rim is in fact as strong at the joint as elsewhere, and the strain or tension of the wheel upon the arch also of course simply tends to compress the meeting and abutting ends more firmly together, so that the strain or tension has no tendency whatever to weaken or loosen the joint.   The interlocking or interfitting tongues and grooves are preferably formed with parallel sides, though this of course is not an absolute essential.   The abutting ends of the interlocking tongues and grooves are also preferably square, but this likewise is not necessary.   The interlocking tongues and grooves are likewise preferably formed of the same length, although the construction may be varied in this regard, if desired.   The joint as a whole or the series of interlocking tongues and grooves are also preferably arranged to extend in a band transversely or at right angles across the rim, but it will be obvious to those skilled in the art that the series of interlocking tongues and grooves might be arranged to extend otherwise than square across the rim—as, for example, diagonally.   It will thus be seen that the tongued and grooved meeting ends of the rim abut one against the other, so that the full natural strength of the circular arch is preserved at the joint and so that the strain or tension of the wheel upon the circular arch has no tendency to weaken or loosen the joint.

103 F.—32

By means of these interlocking tongues and grooves extending longitudinally or in the direction of the rim at the meeting ends of the strip I have discovered that an exceedingly firm, strong, and durable wooden rim may be formed, having no tendency to work loose or become weakened at the joints when under strain or in use, and wherein, also, the joint formed in the rim is perfectly water tight, so that no moisture can work in or through the rim at the joint, and wherein the form of the joint in no way tends to weaken or diminish the natural strength of the arch, and wherein, too, the compressing strain or tension upon the arch has no tendency to weaken or loosen the joint.

"In the accompanying drawings, which form a part of this specification, and in which similar letters of reference indicate like parts throughout all the views, Figure 1 is a side elevation of a bicycle wheel embodying my invention. Fig. 2 is an enlarged cross-section taken on line 2 2 of Fig. 1, and Fig. 3 is an enlarged detail view showing in plan the joint formed at the meeting ends of the wooden rim.

"In the drawings, A represents the hub of a bicycle wheel; B, its tension-spokes; C, its elastic tire, and D its wooden rim. The rim D is preferably made of a single solid continuous strip of wood curved into proper circular shape and furnished with the annular channel or groove $D'$, constituting the seat for the pneumatic or other elastic tire C. This wooden rim is furnished at its meeting ends with a series of interfitting or interlocking tongues and grooves $d$ $d'$, extending longitudinally or in the direction of the rim. The opposite sides $d^2$ $d^2$ of each of the tongues $d$ and of the grooves $d'$ are preferably parallel to each other and to the plane of the wheel, though the construction may be varied in this regard. The ends $d^3$ of each of the tongues $d$ and of the grooves $d'$ are preferably square or at right angles to the direction of the rim, as they thus have a better abutment the one against the other, and produce no tendency to spread apart or split the rim, though the construction may be varied in this regard. The series of interlocking tongues and grooves $d$ $d$ $d'$ $d'$ are arranged, preferably, to extend transversely or at right angles across the rim, although the construction may be varied in this regard. The preferable construction is also to make all the tongues and their corresponding grooves of the same length, although the construction in this respect may likewise be varied. The interfitting tongues and grooves $d$ $d'$, when properly interlocked or fitted together under pressure, are secured together by glue or other suitable cement, thus forming a firm, strong, and water-tight joint.

"Another advantage secured by my improved form of wooden rim and construction of joint is that the joint may be so short as to avoid the necessity of making any of the spoke-holes or other holes through it. Heretofore the length of the joint has been necessarily such that one or more spoke-holes must be formed through it, and, as is well known to those skilled in the art, wherever there is a hole made through the joint the tendency is for moisture to work in and in time loosen or injure the glued or cemented joint.

"I claim—

"1. In a bicycle wheel, the combination with a pneumatic or elastic tire and suspension spokes, of a wood rim consisting of a solid strip of wood bent to circular form, channeled on its outer periphery to receive said tire, and having its meeting ends each provided with a series or multiplicity of long narrow interfitting tongues and grooves, glued together, extending longitudinally of the rim and in the plane of the wheel, the ends of the tongues on one end of the rim strip fitting or abutting against the end or bottom of the corresponding grooves on the other end of the rim strip, whereby said rim is furnished with means for performing the triple functions of resisting collapse or compression due to the tension of said suspension-spokes, of acting tensilely to bind or hold the parts of the wheel together, and of resisting breakage, flexure or displacement, as required in its combination with said pneumatic tire and suspension-spokes, substantially as specified.

"2. In a bicycle wheel, the combination with an elastic tire and suspension spokes of a wood rim serving to resist collapse or compression, tensile strains, and also breaking or flexure strains, and consisting of a solid strip of wood, channeled on its outer periphery to receive said tire, and having its meeting ends furnished with a series or multiplicity of interfitting tongues glued together, the glued side surfaces of said interfitting tongues affording an extended

glue surface lying substantially in the plane of the wheel and longitudinally of the rim so as to resist tensile and breakage or flexure strains, substantially as specified."

The drawings accompanying the patent are as follows:

The pertinent portion of Letters Patent No. 238,491, issued to G. E. Davis, March 8, 1881, to which reference is made in the opinion following, is as follows:

"My invention relates to an improvement in chair-seat frames, the object being to provide a novel means whereby the four pieces of an ordinary chair-seat frame may be inflexibly secured together in such a manner that it will not, when so constructed, be weakened by the insertion of the chair legs or posts at the point of juncture, that it may withstand the straining tendency of the flexible caning, and that it may be capable of passing uninjured through the various wrenches and strains to which all chairs of this character are subjected.

"Third, the joint formed in this old construction is a square joint, and a joint of this kind is the very one the least adapted for its purpose here, as it is directly open to the majority of strains and wrenches to which a chair is the most subject, all of which have a direct tendency to loosen the front and back pieces of a chair-seat frame, but particularly the front pieces, both of which front and back pieces are secured to the side pieces by a square joint. The inner edges of the frame pieces are perforated with small holes, through which the cane-strands are passed, and as a matter of course the greatest strain will come on the front piece, and, although the leverage is slight, the strain on the several strands, taken collectively, will exert a very strong and marked force, tending to raise the outer edge of the upper face of the front frame-piece and depress the inner edge of the same. This strain will, in itself alone, in a short time weaken the square-joint connection and loosen the dowel-pins. Another frequent cause of breakage and defect in chairs constructed with square joints is the vertically-tilting strain caused

by tipping back in them, at the same time resting the feet on the front rounds. The chair-legs, thus unsupported and pressed inwardly, will naturally tend to pull the dowel pins from their sockets, and results very often in splitting the front piece of the chair-seat frame.

"A and B represent the front and back pieces of a chair-seat frame, and C and D the side pieces thereof. The front piece, A, is mortised at both ends, a b representing the mortises. Into those mortises fit, in snug connection, the tenons, c d, formed on the front ends of the side pieces, C D. It is preferred to cut the mortises a b rather deep and the tenons c d correspondingly long, so·that the two pieces may become very closely incorporated with each other, and also to prevent a greater side surface to the glue. When these mortised and tenoned ends are driven together they will form a miter-joint; and both pieces being cut diagonally to the grain of the wood forming them, the glue will adhere with equal tenacity to both surfaces presented and form an exceedingly strong joint, where, in the old construction, as it would only adhere to one of the two adjoining frame pieces, its presence added but little to the usefulness and strength of the chair. But this arrangement of long tenons and deep mortises, presenting a large surface to the adhering action of glue, and the manner of cutting the frame pieces diagonally to the grain of the wood and forming a miter-joint, the two pieces joined become so incorporated with each other that a hole for the reception of the chair-leg may be bored, as at E and F, directly at the point of juncture without impairing the value and strength of the connection and without any danger of cracking either of the pieces. Small holes e f g h are made in the inner edges of the frame-pieces for the insertion of the cane-strands i i."

The drawings accompanying the Davis patent are as follows:

Archery Bows, to which reference is made in the opinion, were described by Claude Thompson as follows:

"Q. 5. How were those bows which were made of two pieces constructed?

"A. They were made of two staves of the wood, the upper stave of which was a trifle longer than the lower. These two staves were joined in the center of the bow or place of hand-grip by a finger joint or saw joint, and across the back of the bow, or rather a piece lengthwise of the bow the length of the joint in the center was glued on. Around that was wrapped a wrapping of hempen fibres forming the base of the handle. Around that was glued a piece of plush cloth making the handle cover.

"Q. 6. What was the approximate length and size of these bows?

"A. The approximate length was six feet. At the center they were probably two inches in diameter tapering both ways gradually to probably a quarter of an inch in diameter.

"Q. 7. And for what were they used?

"A. They were used for weapons of sport at archery practice at targets or as implements of the chase.

"Q. 8. How many jointed bows, of the description which you have just given, have you examined so as to know their construction in detail?

"A. Probably half a dozen.

"Q. 9. State whether or not the bows which you examined and learned to be constructed as you have described were used?

"A. They were all of them.

"Q. 10. Where were they used?

"A. They were used in the United States in different parts of the country, principally at Crawfordsville, Ind.

"Q. 11. And by whom were they used, as far as your recollection serves you?

"A. The ones that I have examined particularly were used by Maurice Thompson and Will H. Thompson, though I may have seen some and examined them used by others whom I do not now recollect.

"Q. 12. Maurice Thompson is your father?

"A. He is.

"Q. 13. And William H. Thompson, of whom you speak, is your father's brother?

"A. He is.

"Q. 14. At what time or period did you see the kind of bows, which you have described as possessing a central figured joint, used?

"A. The period covering from 1872 or 1873 to 1884. That is, they were in actual use during those times. Bows having the same construction are now in my father's possession and have been used within the year."

The further facts necessary to the decision of this case are stated in the opinion of the court.

John W. Munday, for appellant.

H. G. Underwood and E. H. Bottum, for appellee.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

GROSSCUP, Circuit Judge, after the foregoing statement of facts, delivered the opinion of the court, as follows:

While mere results are not ordinarily patentable, many constructions, and many processes—simple and obvious enough when looked at after the occurrence—have been held to be patentable inventions, not so much because the patentee exerted inventive thought in his immediate work of construction, as because the step taken lay toward the creation of some new aid to the convenience of mankind—some distinct addition to the equipment of civilized life. Such, for illustration, was Glidden's barbed wire fence, and the Goodyear hard rubber, or Vulcanite. The merit, attributed to this class of invention, lies in the end reached, rather than in the means employed. In determining the validity of patents of this character the courts have been liberal in their inclination to overlook the obviousness of the

means devised, in their purpose to reward, if possible, the mind that has added something new to the sum of valuable things.

The patent under consideration does not fall within this class. Marble has not introduced into the world a new article, or a new means of making an old article. He did not conceive the wooden bicycle rim, or the desirability of its having a strong, close joint. The rim was already in existence, and the necessity for such a joint was already obvious; and, in the allied arts, the precise joint, in all features of mechanical construction, was already at hand.

The cardinal purpose of joints, in whatever use employed, has always been to resist strain. The principal strains upon the wooden bicycle rim may be stated as follows: The vertical strain arising from the load upon the wheel; strains not necessarily vertical, but in the plane of the wheel, caused by hard, abrupt contact with objects in its path; torsional strains due to the sudden turning of the wheel to maintain equilibrium; and torsional strains, frequently wrenching in character, caused by the wheel falling into uneven places, such as holes or ruts. It is, of course, impossible to preconceive every character of strain to which the rim is exposed; they run in form, both simple and compound, from the straight, steady, vertical strain upon an upright wheel, to the sharp, sudden, transverse strains of a falling wheel, or a wheel caught in a rut. They comprehend, in variety, perhaps, and in intensity, a larger number than any joint in the prior art was expected to resist; and in that respect alone the problem presented difficulty.

This difficulty was sought to be overcome—as many such are— not by the invention of something new, but by experimentation in the adaptability of joints already well known. The selection of the joint described in the patent under consideration was the result of tests made of the joints of the prior art. Marble searched the old art for the joint best fitted to meet the required conditions. The lap-joint was discarded because its ends, being nonabutting, were liable, under tension or sudden strain, especially when moistened from mud holes or wet grass, to loosen and slip toward each other. It was found that the coherence of the glued surfaces of lap-joints, unaided by the shouldering of end against end, was inadequate to the strains imposed. The joint described in the patent was chosen, chiefly because the ends of the fingers abutting squarely against the ends of the corresponding groove brought to the joint the compactness and strength of shouldering; because the longitudinal fingers inserted into these grooves knit the joint more closely together against torsional strain; and because, perhaps, the glued surfaces, being in the plane of the wheel, exerted against vertical strain a greater coherency than if they had been transverse to the plane of the wheel. But the last consideration is not mentioned in the patent, and would be as inefficient against torsional strains, except for the reinforcement of the timber strength of the fingers, as were the Harrington glued surfaces against vertical strains. The joint, as a whole, as the patent shows, and the nature of the problem required, was chosen, not for any one reason, but for many reasons, among them those already pointed out.

It has already been said that the joint chosen for this new use

was itself old. Indisputably, in its precise mechanical construction, it has been in constant use in the allied arts. Some illustrations have been called to our attention. We have incorporated into the statement of facts but two—the Davis Chair and the Archery Bow—not because they stand alone in the art of joinery, but because they are examples of many uses of the same general character. The strains imposed upon the joint of the Davis Chair are, of course, different in degree, and in variety, from those upon the rim of a bicycle wheel; but it is apparent that some of them tax the capacity of the glued surfaces to hold together; and that the coherency of these glued surfaces is enhanced by the fact that the strain applied is in the direction of the plane of the joint. It makes no difference that, ordinarily, the strain of the Davis joint falls upon the shouldering of the inner ends of the interlocking fingers against the ends of the corresponding grooves. The fact remains that, in the use of the chair, there are strains that tax the coherency of the glued surfaces. The purpose of the chair joint is to meet these strains, though occasional only, as well as those of a more common character.

The strain upon an archery bow is in the direct plane of the surface of the joint. It differs from like strains upon the rim of a bicycle wheel only in the fact that in the bow the strain is a more constant one,—not the result of a sharp, abrupt stroke,—and that the strength of the joint is re-enforced by its wrappings. But here, as in the bicycle rim, the strain is borne by the capacity of the glued surfaces to hold together.

But counsel for appellant insist that the transference of this old joint into the uses of the bicycle rim is patentable invention, not because the joint is in any part new; nor because, in its later use, it performs a function different from that of its prior uses; but solely because, to use the language of the brief:

"Marble was the first to discover the highly important and valuable fact that a glued joint between two pieces of wood is many times stronger against breaking strains applied in the plane of the joint than it is against breaking strains applied at right angles to the plane of the joint."

We are not convinced that Marble was the first to understand this fact in the art of joinery. It is one, indeed, that seems obvious to any mind giving it a little thought. It was, it is true, not phrased in so many words by the inventor of the Davis patent, or the designer of the archery bow, or the hundred others who have put together for similar purposes similar joints; nor were all the other principles of physics entering into the strength of such joints specially pointed out. Upon what reasoning may we say that the designers of these prior joints, because they omitted its mention, must have been in ignorance of so obvious a principle? Would not such reasoning attribute to men, who have worked and thought in the art of joinery for centuries, an obliviousness that is almost incomprehensible?

But if omission of specific mention of this so-called principle of physics is proof that the thought was not present with the prior joiners, upon what reasoning shall we accredit its presence to Marble, who, through more than the two hundred lines of his patent, makes no mention of it, either as a discovery, or as a fact. Pains are taken by him to point out that the joint for which he asks a patent is strong

and efficient; is simple and cheap of construction; that the meeting
ends of the strips shoulder, end to end, so that the arch of the rim
is in fact as strong at the joint as elsewhere; that the tongued and
grooved meeting ends of the rim, extending longitudinally and abut-
ting one against the other, make a strong, firm, and durable rim; and
that the joint thus formed is perfectly water tight. These are all
advantages that Marble thought it worth while to specially mention,
and some of them, such as the square shouldering of the fingers, end
to end, were reiterated; but nowhere is there an allusion to a discov-
ery that a glued joint between two pieces of wood is many times
stronger against breaking strains applied in the plane of the joint
than it is against breaking strains applied at right angles to the plane
of the joint. If failure to mention this principle of physics by the
prior joiners is proof that they were in ignorance of its existence, we
can see no reason why a like omission in the Letters Patent under con-
sideration should not be regarded as proof of a like ignorance upon the
part of the patentee. The logic applied by counsel to the silence of
the prior art results, when applied to the Marble patent, in the com-
plete undoing of the claimed discovery. We are, on the whole, con-
tent to hold that there is no sufficient evidence, either in the patent,
or in the record before us, upon which to predicate a finding that this
so-called principle of physics relating to the strength of glued surfaces
is an original discovery of Marble.

Laying aside this claim, then, as untenable, the question recurs,
Does the transference of this joint from the older uses into this later
use embody patentable invention? In both the earlier uses and the
later the joint performs the same function; in both it is intended to
resist strains of many kinds, from many directions, and of many
degrees of intensity; in both the resistance is accomplished, partly
by the ends of the fingers, and their corresponding recesses shoulder-
ing squarely together; partly by the strength that a close knitting of
the timber accomplishes; and partly by the glueing of the surfaces in
the plane of the joint. The joint, as a whole, is the old joint, put,
perhaps, in its later use, to the test of severe strains; but bringing
to these tests no element of resistance not utilized in the older uses.
Such a joint is, in no sense, and to no degree, a new mechanical means
unless it can be said also that a beam made to resist one hundred
pounds of pressure is different from a beam made to resist one thou-
sand, in cases where both, except in dimension, are mechanically
the same.

The decree of the Circuit Court must be affirmed.