HUEBNER-TOLEDO BREWERIES CO. v. MATHEWS GRAVITY CARRIER CO.

(Circuit Court of Appeals, Sixth Circuit. October 8, 1918.)

No. 3125.

1. PATENTS ⊙⟿26(1)—INVENTION—ADAPTATION OF OLD DEVICES.
    To adapt an old and familiar device to another structure equally old and well known is not to exercise the inventive faculty, but to apply the skill of the mechanic.

2. PATENTS ⊙⟿19—INVENTION—IMPROVED RESULT.
    A mere carrying forward of the original idea, a change in form, an improvement in degree, without substantial change in either means or result, is not invention.

3. PATENTS ⊙⟿26(2)—INVENTION—COMBINATION OF OLD ELEMENTS.
    The selection and putting together of the most desirable parts of different machines in the same or kindred arts, making a new machine, but in which each part operates in the same way as it operated before, and effects the same result, cannot be invention.

4. PATENTS ⊙⟿36—INVENTION—COMMERCIAL SUCCESS.
    Commercial success is never a safe criterion of invention, except in cases of doubtful validity of the patent.

5. PATENTS ⊙⟿328—VALIDITY—GRAVITY CARRIER.
    The Mathews & Lister patent, No. 890,917, and the Mathews patent, No. 978,466, each for improvements in gravity carriers, are both void for lack of invention, in view of the prior art.

Appeal from the District Court of the United States, for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Suit in equity by the Mathews Gravity Carrier Company against the Huebner-Toledo Breweries Company. Decree for complainant, and defendant appeals. Reversed.

Russell Wiles, George A. Chritton, and Wm. H. Dyrenforth, all of Chicago, Ill., for appellant.

A. C. Paul, of Minneapolis, Minn., and Wilber Owen, of Toledo, Ohio, for appellee.

⊙⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This suit is based upon alleged infringement of two patents; it is met in the answer, not only by denial, but particularly by allegation that the claims of these grants are "wholly and entirely void, as not involving anything more than ordinary mechanical skill over what is common knowledge in the art," and a great many prior patents are referred to. The patents in suit are (1) No. 890,917, issued June 16, 1908, to Mathews & Lister, assignors to Mathews Gravity Carrier Company, and (2) No. 978,466, issued December 13, 1910, to Mathews, assignor to the same company. That company was a Minnesota corporation, and its rights, so far as this suit is concerned, have passed to the appellee, a Pennsylvania corporation. The patents were each in terms granted for "improvements in gravity carriers," and will be mentioned hereafter, in the order of their dates, as the first patent and the second patent. Claims 2, 4, 5, 6, 7, 8, and 9 of the first, and all the claims of the second, patent are in issue; and both patents, as respects the claims in issue, were held valid and infringed by the court below. The cause was referred for an accounting and damages, and perpetual injunction was issued. By consent the master reported that appellant had purchased from a company named (though not a party to the suit), and had used in its business, "material found by the court in its decree to be an infringement," and stated the amount of appellee's loss of profits thereon. The Breweries Company appeals.

We may as well say at the outset that, if the patents are valid, they are, at least as to some of the claims in issue, infringed. The important feature of the case is found in the issue of validity. This issue in the end is one of fact. It is whether the disclosures of the patents, when compared with the prior art, amount to anything more than the natural developments of the skilled mechanic. The first patent relates, in the language of the specification, "to carriers designed particularly for transporting brick and similar articles of comparatively small dimensions by gravity." Generally speaking, the carrier comprises two parallel side rails, with a series of transverse metal tubular rollers having ball bearings at their ends and having rods extending through their longitudinal centers, and also through the side rails, where they are held by means of lock nuts; the rollers so mounted rotating freely on their respective rods or axles. The carrier is constructed in sections of lengths suitable for removal from one place to another, and the sections are provided with projecting ends adapted to fasten one section to another, and so to form a continuous structure of such length, along such courses, and at such a grade as the convenience of the user may require. Another feature of this patent is that the rollers are provided with flanges or rims at the ends, on which packages of greater width than the length of the rollers may be placed and transported. The specification states: Side guards or other frictional interference with packages moving on the carrier are dispensed with; the packages follow "the line of least resistance" and travel "in the direction of rotation of the

wheels," and may thus be moved from one point to another along the roller surface of the carrier, when maintained at a slight grade. The character and details of the structure will be readily understood by reference to the following drawings which accompany the letters patent:

"Fig. 1 is a plan view of a brick carrier embodying our invention. Fig. 2 is a transverse sectional view, one end of a roller being broken away to illustrate the bearing for the same. Fig. 3 is a perspective view showing a portion of a carrier and the bricks thereon." [1]

[1] Although claim 1 is not in issue, yet the flanged rollers displayed in the drawings will be explained by that claim:

"A gravity carrier comprising side rails, rods connecting said rails at intervals, metal rollers having flanged ends and ways and balls fitting there-

It will be observed that the rods with threaded terminals not only pass through the rolls (including the ball-bearing appliances), but also through the side rails, upon the outside of which they are fastened by lock nuts 4. This seems to have rendered it inconvenient to remove a single rod with its accompanying roller, since it required removal of one of the side rails entirely. It was sought to overcome this by the second patent. The chief difference between the two patents is thus stated by counsel for appellee:

"The second patent differs from the first principally in the provision of convenient means for removing a single rod with its accompanying roll without in any way disturbing the adjustment of any other roll. This is accomplished by having the side rails provided with slots or notches in the upper edges, with the rods detachably mounted in such notches, thus making it possible to immediately remove any roll from the carrier without disturbing the other rolls."

The means so provided in the second patent may be seen in Fig. 2 of the drawings accompanying the letters patent. It follows:

Fig 2.

"In the drawing, 2 represents the side rails of the carrier, composed preferably of flat steel bars. These bars are provided at intervals in their upper edges with vertical slots or notches 3 adapted to receive rods 4 having threaded ends and provided with lock nuts 5 and 6, the former on the outside of the bars and the latter between them. * * * Any roller can be easily removed from the carrier by loosening the lock nuts 5."

We may mention one or two other changes that were made in the device of the second patent. One involves the sectional coupling. It is said in the specification of the first patent that the sections are made of any suitable length and "coupled together at their ends"; while in the second patent it is stated that various forms of coupling devices may be provided, but preference is given to "a tongue 19 on the end of

in, cones mounted on said rods and having bearing surfaces, and between which surfaces and said ways said balls are arranged."

And as further explanatory of the elements comprised in the patented device we think it sufficient for present purposes to add a claim that is in issue:

"2. A gravity carrier comprising side rails and means connecting them at intervals, and rollers having anti-friction bearings at their ends upon said connecting means and forming a way over which comparatively small articles such as brick may be transported, said rollers being of substantially uniform diameter between their ends and extending above the tops of said rails, substantially as described."

each rail *2* bent outwardly to offset it from the plane of the rail and adapted to fit between a plate *20* and the end of the abutting rail." These parts may be riveted or bolted together. Another change was made through the use of additional braces. Apparently three within each section are disposed at right angles with the side rails and fastened to them, and between these braces are two sets of diagonally crossing braces; the object being to hold the sides of the carrier in "parallel relation with one another." Claims 1 and 4 are copied in the margin further to illustrate the second patent.[2]

Appellee offered in the court below one section of the Mathews gravity carrier as an exhibit. This exhibit, as we understand, and additional sections of the carrier, were displayed and operated as a unitary structure at the hearing in our court. The exhibit seems to comprise the main features of the two patented devices in suit, except in two or three respects: The rollers have no flanges, but are disposed so that their upper plane is above that of the side rails; thus flanges are rendered unnecessary for transporting "articles of greater length than the width of the carrier"; the flanges were distinct features of the first patent, and of the specification and drawings of the second patent, though they appear to have been given up in the structure exhibited. Further, this exhibit omits lock nuts *4* of the first and *5* and *6* of the second patent, and also the threads upon the end portions of the cross rods passing through the rollers of both patents. The notches of the second patent, it is true, are preserved in the side rails of the exhibit; but instead of lock nuts *5* a metal bar, extending throughout the length of a section and having slots disposed therein so as to engage the ends of the cross rods, is bolted to the outer and upper surface of each side rail. Lock nuts *6* are replaced in function by (a) notches cut into the cross rods near their ends so as to fit into and be held fast by the notches of the side rails, and (b) tubular portions of the ball-bearing devices surrounding the cross rods and extending from the ends of the rollers almost to the side rails; the purpose seems to be to hold the rails in "parallel relation with one another" and also free from the ends of the rollers. This substitution of a slotted metal bar and notched cross rods apparently has the further purpose of facilitating the separate removal of rollers. Whether we have or not rightly interpreted the objects of these differences between the patents in suit and the exhibit, the changes serve to characterize methods of progress which may well be considered in trying under the facts of this case to distinguish between skill and invention. We come now to an inquiry into the state of the art prior to the dates of the patents in suit.

[2] "1. A gravity carrier having side rails composed of flat metal bars having slots or notches in their upper edges, rods detachably mounted in said slots and connecting said rails, and rollers having anti-friction bearings on said rods, substantially as described."

"4. A gravity carrier comprising side rails, diagonally arranged brace bars connecting said rails, cross rods also connecting said rails, the upper edges of said rails being provided with vertical slots or notches and rollers detachably mounted in said notches."

(1) *Gravity Carriers Old.*—In point of equivalency more of the present elements, whether considered singly or in combination, are perhaps to be found in Alvey's gravity conveyer, patented in 1902, No. 714,432, than in any other prior patent. Alvey stated in his specification:

"My invention relates to conveyers for the purpose of transferring goods from place to place—such as boxes, barrels, and packages—the movement of the packages or other articles being ordinarily effected by gravity; but it is to be understood that the invention is not confined necessarily to a conveyer on which the articles are moved by that force alone. * * * The invention has for its objects to enable goods to be transferred from one point to another, as in a warehouse, expeditiously and with a minimum of hand labor and to allow of the apparatus being adjusted to receive goods at different points, and to deliver them at different points as may be required, expeditiously and with certainty."

Among the drawings accompanying the letters patent are the following:

"Fig. 1 is a perspective view showing a conveyer of portable character embodying my invention set up in a warehouse for the transfer of goods from one point to another. * * * Fig. 3 is a plan view of a portion of the same. * * * Fig. 7 is a sectional view of the roller bearing. * * * Each of the straight sections *A* comprises side pieces *1*, of wood or other suitable

material, united at suitable points by transverse connecting members or tie rods 2. These side pieces have formed in them or attached to them bearings 3 for the shafts or journals 4 of the transverse rollers C. The latter are spaced apart, but are sufficiently close together to enable the goods to be conveyed to pass from one roller to the next without falling through. The curved sections B are constructed on similar principles, but with inner and outer curved side pieces 5 and 6, the rollers C' of said curved sections being arranged on lines radial to the center of the curve on which the section is constructed. * * *

"It is highly important that the rollers should revolve freely under packages of relatively light weight, to which end the rollers must not be too heavy or have too much inertia. On the other hand, they must be strong enough to carry heavy weights when required. I have constructed the rollers, after much experimentation, of a material which meets both these requirements. They are made from a pulp of hard fiber of relatively light specific gravity, known as 'leatheroid.' They are thus also seamless, without grain, and not liable to crack."

As illustrative of the combinations and essential elements involved, two of the claims are copied in the margin.[3]

Alvey further developed the gravity carrier art through his patent of May 23, 1905, No. 790,776, under an application filed September 5, 1904. He introduced a spiral gravity conveyer adapted to carry all kinds of articles usually stored in warehouses, from any of the upper floors to the basement or shipping room, and to discharge packages at any of the intermediate floors. The spiral conveyer is adjusted to and supported by a vertical post extending through such floors of the building as may be desired, with suitable openings through which to maintain the conveyer and carry packages; in order to distribute packages at intermediate floors, gravity switches are removably connected with the spiral portions of the conveyer; provision is made for carrying articles to the spiral parts by gravity conveyers, which, as also the switches, are similar in form to the structures above shown in Alvey's patent of 1902, No. 714,432. Alvey went still farther in 1905, under an application of September 5, 1904, through his patent, No. 790,811. There he provided for lifting, instead of lowering, packages from floor to floor. The conveyer is maintained at an ascending grade and driven by power. It is to be observed of both of Alvey's later structures that the carriers are divided into sections with angle iron side rails.

Some 14 years before the issue of Alvey's first patent, Pusey secured a patent, No. 387,733, upon a structure called an "artificial toboggan or coasting hill," which is instructive in the gravity carrier art. The specification states:

"The trackway consists of a series of rollers journaled transversely in a suitable framework."

---

[3] "1. In a portable conveyer, the combination of a plurality of sections provided with transverse rollers, and supports for said sections, the upper part of each support being hinged to the conveyer-section and the lower part of each support being adjustable on said upper part."

"6. In a gravity conveyer, the combination of a series of separately and freely rotatable rollers, and means for supporting the same to form an inclined way, said rollers being constructed with shoulders 16 and intermediate recessed portions, and adapted to automatically maintain packages in the middle of said way, substantially as set forth."

The simplicity of the structure will be seen by reference alone to some of the accompanying drawings:

"Fig. 1 is a side elevation. Fig. 2 is a plan. * * * Fig. 5 is an elevation of roller detached, with end view of the toboggan thereon. * * * a, Figs. 1 and 2, represents longitudinal frames or stringers supported by a trestlework or posts, b, and provided with bearings c, for the journals of the series of wide transverse rollers D."

The cylindrical portions of the rollers are made of waterproofed paper or strawboard, or similar light and strong material. The patentee states in his specification:

"I am aware of the fact that roller trackways for sleds are old, * * * in which trackway were inserted rollers or balls for the runners of the sleds to descend upon; and I do not therefore claim broadly, as new, an inclined trackway with rollers therein."

The patentee's idea of the scope of invention open to him is important and is sufficiently explained by claim 1 copied in the margin.[4]

In 1885 Hinds & Mace received a patent on a portable chute, No. 312,468, saying in their specification:

"The invention relates to inclined slideways, and is specially adapted to transfer tiles, bricks, or similar articles from the drying shed to the kiln, or from the kiln to the yard. The slideway is made in sections, each of which has its floor composed of rollers having bearings in the sides of the sections."

Palmer obtained a patent in 1888, No. 376,340, on an elevator, which may properly be regarded as a distributing contrivance; it was designed for carrying goods or other materials up or down in a warehouse, store, manufactory, or other similar place of business, and automatically

---

[4] "An artificial coasting course or toboggan slide, consisting of the combination of the inclined longitudinal frames or stringers, the supporting frame or trestlework, and the series of rollers journaled in and between said stringers, adjacent to and out of contact with each other, substantially as and for the purpose set forth."

delivering them at different floors or stations, and there depositing them upon an "inclined series of rollers" disposed transversely between parallel side rails, whence they were moved by gravity to the place desired; the particular use illustrated by the drawings related to the manufacture and handling of bricks.

(2) *Metal Side Rails and Rollers.*—It will be noticed that none of the prior patents thus far considered in terms calls for metal rollers; but it is to be remembered that the last two Alvey patents mentioned call for metal side rails. Assuming that a change of material, say from wood to metal, was important in a frictional sense or otherwise, there were kindred power-driven conveyers which expressly provided for metal rollers; and we think such conveyers may fairly be treated as part of the prior art in question. They are certainly of a closely analogous art. Holman provided for the use of metal rollers in 1885 in his power-driven railway track layer, patent No. 315,034. He fastened to the outer sides of cars a sectional tramway, comprising parallel side rails, called "parallel bars," with transverse metal rollers journaled in the bars. The rollers were used to convey ties and rails from the cars to points in front of the train in the line of the proposed railway construction. Again, in Hanna's carrying roll, patented October 28, 1902, No. 712,061, we find a design for metal tubular rollers of uniform diameter, with integral journal portions, which are intended as carriers of belts for "elevators, conveyers, and similar classes of machinery." The patentee made no provision for side rails or other familiar bearings upon which to operate his rollers as carriers; nor was such omission unusual. See, for instance, the carriage with rollers in the brick and tile machine of McKenzie, patented in 1878, No. 203,284, and in Aiken's feed table for rolling mills, patented in 1890, No. 439,925. Further, Alvey emphasized in the portion of his specification above quoted the importance of rollers that would revolve freely under packages of relatively light weight and yet be strong enough to carry heavy weights when required; and he says that "after much experimentation" he adopted a material for rollers called "leatheroid," which was "seamless, without grain, and not liable to crack." [5] Pusey had pointed out years before, that rollers might be made of "suitable light material," saying that the "ease with which the inertia and friction of the rollers are overcome * * * of course depends mainly upon the weight" of the rollers. He preferred "compacted waterproofed paper or strawboard," and as we have seen used such rollers in his gravity toboggan. The experience of Alvey and that of Pusey as expressed by each in his specification, and more particularly the use made of the metal rollers as above stated, were manifestly suggestive of the adoption of metal rollers for gravity carriers. Wright v. Tobacco Co., 252 Fed. 146, —— C. C. A. ——, decided by this court August 3, 1918.

(3) *Stationary Axles with Revolvable Rollers.*—Appellee points out a difference between the patents in suit and the gravity conveyers of

[5] Alvey's roller metal journals and metal bearings with oil-retaining chamber 22 to lubricate them, are another important feature to be observed. They are illustrated in Figs. 7 and 8 of his drawings, supra.

the prior art as respects the relations between the axles and rollers of the two sets of structures. True, as we have seen, the axles of the former are stationary and the rollers with ball bearings revolve upon them; while the rollers of the latter have rigid and axially connected journals which are mounted on bearings in the side rails and revolve with the rollers. Apart from the ball bearings of the patents in suit, considered later, the plan of an exterior roller (composed of "sleeves") distinct from an interior part axially carried by side bearings was shown, for instance, by McKenzie in 1878 in his brick and tile machine before pointed out. Holman, above mentioned, provided metal rollers with annular flanges at their ends; but he also stated in his specification that he "proposed to make these rollers hollow, and of metal, and to mount such construction of roller on a stationary axle which passes through the closed ends of the roller, whereby the bearing is entirely at the ends of the roller." Perhaps the commonest examples of this latter construction are found in the ordinary road wagon, having rigid axles and spindles with hubs turning upon the spindles, and in the idle wheel to which a belt is shifted when not in use for transmission of power, while the bicycle furnishes a complete illustration, as for instance, the Douglas bicycle, patented in 1892, No. 469,627.

(4) *Sectional Carriers.*—In view of what has been pointed out it is scarcely necessary to allude to this feature of the patents in suit. We have seen that Alvey's patent, No. 714,432, divides the carrier into sections with "firm connection of the various sections end to end," the connecting parts being described in the specification and shown in the drawings; this in substance is true of Alvey's patent, No. 790,-776, of the Hinds & Mace patent, and also of the Spence portable conveyer, Pat. No. 779,139. We do not stop to consider the horizontal and diagonal braces of the sections, because such bracing is familiar in structures of everyday use, such as the ordinary stepladder, trestle or scaffold.

(5) *Notched Frames.*—It is contended that the patentee of the second patent in suit "introduced for the first time the feature of the slotted side rails whereby any through shaft and roller could be removed separately." This is to overlook Winter's provision of the same character in his skid for moving rails, patented September 19, 1905, under application of 1904, No. 799,699. The rollers are there mounted in open slots and, as his specification states, "may be easily removed when broken or worn out and replaced by others." Such slots or notches were old when Winter adopted them. The drawings of the McKenzie patent of 1878, before cited, plainly show notches in the upper edges of the side bars in which the rollers were journaled, though the patentee does not seem to have thought it worth while even to mention the notches in his specification or claims. However, the notches must be regarded as "described" in a "printed publication" within the meaning of the patent act (Keene v. New Idea Spreader Co., 231 Fed. 701, 708, 145 C. C. A. 587, and citations [C. C. A. 6]); this is true of the drawings of Aiken's and Spence's patents, supra. Apart from Winter, these patentees do not state, though it is manifest, that the notches shown were designed in part to admit of separate

removals of rollers. Further, the convenience of open slots with parallel sides adjusted to corresponding sides cut upon stationary axles near their ends was in practical purpose shown in the Douglas patent; indeed, in the respects mentioned the slots and axles of the gravity carrier exhibit offered in evidence closely resemble the slots and axle of the Douglas bicycle.

(6) *Ball Bearings.*—The ball bearings of the patents in suit and the carrier produced in court differ in some details, but in essential respects they are all like those commonly used in bicycles; in fact, these carrier rollers with their ball bearings are clear equivalents of the hubs and ball bearings of the ordinary bicycle. This is sufficiently shown by the following patents: Teetor in 1891 for "ball bearing," No. 456,664; Douglas, supra; Sturgis in 1897 for a bicycle training device, No. 581,835; Svensson in 1897 for anti-friction journal bearings, No. 580,994; and it appears in Teetor's specification, besides being well known, that bicycle ball bearings were old in 1891. The analogy to appellee's designs for ball-bearing rollers found in the Sturgis bicycle training device is very persuasive. This device comprises three rollers mounted transversely between uprights fastened to the longer sides of a rectangular adjustable frame; the rollers are provided with axles passing through and beyond their longitudinal centers and journaled in the uprights. A sprocket chain connects the middle and forward rollers, and the three rollers are so disposed upon the frame as to engage the wheels of a bicycle and to enable the rider to operate it the same as if riding on a road; and although the body of the bicycle remains stationary, its wheels revolve upon the rollers. The specification states:

"The rollers are journaled on their respective axles by means of suitable ball bearings."

The ball bearings are not otherwise described except as they are shown in Fig. 4 of the drawings. They appear to be of the usual bicycle type and to be operated similarly to those of the appellee's carrier. It is to be noticed however that the Sturgis ball-bearing device is for the most part extended beyond instead of being countersunk into the ends of the roller; the cups seem to be integral parts of the roller, while the cones are threaded upon the ends of the axle, and opposed annular rings are provided in the cups and cones for ball races or containers. Although the material of which the rollers are composed is not shown and is not very important, yet apparently it is metal.

We have thus been at pains to point out earlier devices as means for testing the issue of fact concerning the validity of the patents in suit; and we are unable to find in these patents any advance over the prior art except in degree. The idea of a gravity carrier was not new. In one form or other such carriers had been designed, patented and, inferentially at least, put into use. Alvey had designed them for purposes precisely similar to those of the patents in suit. Even the kinds of business which Alvey's carriers and those of appellee were intended to aid, the emplacements of the carriers and their modes of

operation, the results to be attained, all are practically the same. The marked resemblances in matters of equivalency between the two sets of devices cannot escape attention. In a word, the devices themselves, the new and the old, as they are shown in the drawings and in the descriptions of the patentees, speak in terms amounting to a demonstration.

We understand it to be admitted, it certainly is true, that every element of the claims in suit is old. What has been done here is to adapt and substitute some old and familiar devices in place of certain parts of the earlier gravity carriers, particularly Alvey's. This involved for the most part simply a change in the material of parts comprised in the earlier carriers; and these substituted devices practically perform, not only the same functions as had been performed by the replaced parts, but also the same functions as they themselves had performed in devices of the prior art. It may not be amiss to show again where some of the important substituted parts may be found in the prior art: Appellee's metal roller was described by Holman, in 1885, and the rigid axle (with whatever incidental support the axle furnishes to the side rails) and ball bearings were shown by Sturgis, and the perfectly plain equivalency of the bicycle hub with its ball bearings and rigid axle should also be borne in mind; the notches or slots of the side rails and the facilities they afford for separate removal and replacement of rollers were shown and explained by Winter and Douglas; as to the metal side rails, it is necessary only to recall those of Alvey's last two patents; the remaining parts of appellee's devices are negligible; and after all the old and the new carriers in precisely the same way transport packages by gravity.

[1] It must, of course, be conceded that patentable novelty may exist in a combination of old elements; but here the combination claims in suit are lacking in the usual and essential tests of invention. No new function of elements or new method of operation is evolved, and the result achieved is exactly the same as the old one. The settled rule under such facts is that to adapt an old and familiar device to another structure equally old and well known is not to exercise the inventive faculty; it is to apply the skill of the mechanic. Aron v. Manhattan Railway Co., 132 U. S. 84, 88, 10 Sup. Ct. 24, 33 L. Ed. 272; Peters v. Active Mfg. Co., 129 U. S. 530, 537, 9 Sup. Ct. 389, 32 L. Ed. 738; Crescent Brewing Co. v. Gottfried, 128 U. S. 158, 169, 9 Sup. Ct. 83, 32 L. Ed. 390; Penn. Railroad v. Locomotive Truck Co., 110 U. S. 490, 494, 4 Sup. Ct. 220, 28 L. Ed. 222; Weir Frog Co. v. Porter, 206 Fed. 670, 676, 124 C. C. A. 470 (C. C. A. 6); Frederick R. Stearns & Co. v. Russell, 85 Fed. 218, 226, 29 C. C. A. 121 (C. C. A. 6); Indiana Novelty Mfg. Co. v. Crocker Chair Co., 103 Fed. 496, 502, 43 C. C. A. 287 (C. C. A. 7).

[2] It may further be conceded that appellee's carriers are better than the Alvey carriers or any others of the prior art; this, too, is unavailing. It is met by the old rule that a mere carrying forward of the original idea, a change in form, an improvement in degree, without substantial change in either means or result, is not invention. Railroad Supply Co. v. Elyria Iron Co., 244 U. S. 285, 292, 37 Sup.

Ct. 502, 61 L. Ed. 1136; Wagner v. Meccano Limited, 246 Fed. 603, 608, 158 C. C. A. 573 (C. C. A. 6), and citations. Superiority is not enough. Grinnell Washing Machine Co. v. Johnson Co., 247 U. S. 426, 38 Sup. Ct. 547, 62 L. Ed. 1196. It can scarcely be doubted that the defects if any in the Alvey structures might have been remedied by the skilled mechanic. Keene v. New Idea Spreader Co., 231 Fed. 701, 710, 145 C. C. A. 589 (C. C. A. 6). This derives emphasis from the changes made in appellee's carrier, as we have pointed them out in the exhibit produced in court.

[3] It is said that appellee's carrier is not anticipated by any single patent; but it is not necessary to show complete anticipation in a single patent. The selection and putting together of the most desirable parts of different machines in the same or kindred art, making a new machine, but in which each part operates in the same way as it operated before and effects the same result, cannot be invention; such combinations are in the nature of things the evolutions of the mechanic's aptitude rather than the creations of the inventor's faculty. Thompson v. Boisselier, 114 U. S. 1, 11, 5 Sup. Ct. 1042, 29 L. Ed. 76; Luten v. Whittier, 251 Fed. 590, —— C. C. A. ——, decided by this court May 7, 1918; Elite Mfg. Co. v. Ashland Mfg. Co., 235 Fed. 893, 895, 149 C. C. A. 205 (C. C. A. 6); Kelly v. Clow, 89 Fed. 297, 303, 32 C. C. A. 205 (C. C. A. 7); Keene v. New Idea Spreader Co., supra, 231 Fed. at pages 708, 709, 145 C. C. A. 589.

[4] Assuming, as counsel claim, that large sales have been made of the carriers in issue, still commercial success is never a safe criterion, except in cases of doubtful validity of the patent; such success cannot aid claims that are clearly without patentable novelty. Olin v. Timken, 155 U. S. 141, 155, 15 Sup. Ct. 49, 39 L. Ed. 100; Grinnell Washing Machine Co. v. Johnson Co., supra; Keene v. New Idea Spreader Co., supra, 231 Fed. at page 710, 145 C. C. A. 589.

[5] We conclude that the claims in issue under the first patent in suit and all the claims of the second one are null and void for want of invention; the decree is accordingly reversed, and the cause remanded, with direction to dismiss the bill; and appellant will recover costs, except such as arise from one-half the copies of letters patent introduced by it, 60 in all, and embodied in the record.