A. SCHRADER'S SON, Inc., v. DILL MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1920.)

No. 3315.

1. PATENTS &328—CLAMPING DEVICE FOR PNEUMATIC TIRES VOID FOR LACK OF INVENTION.

The Schweinert & Kraft patent, No. 783,469, for clamping device for pneumatic tires, *held* void for lack of invention, in view of the prior art.

2. PATENTS &328—DUST CAP FOR TIRE VALVES VOID FOR LACK OF INVENTION.

The Burke patent, No. 1,253,573, for dust cap for tire valves, *held* void for lack of invention, in view of the prior art.

Appeal from the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit by A. Schrader's Son, Incorporated, against the Dill Manufacturing Company. Decree for defendant, and complainant appeals. Affirmed.

Arthur C. Fraser, of New York City, for appellant.
Arthur J. Hudson, of Cleveland, Ohio, for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

&For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

PER CURIAM. Suit for infringement of claim 3 of United States patent No. 783,469, February 28, 1905, to Schweinert & Kraft, for clamping device for pneumatic tires (the specific feature being a protective casing or cap for stay bolt extension, applicable also to tire valve stem casings), and claims 1 and 2 of United States patent No. 1,253,573, January 15, 1918, to Burke, for dust cap for valves (such as tire valve stems).

On hearing upon pleadings and proofs, the District Court found both patents invalid—that to Schweinert & Kraft for lack of invention, in view of the prior art; that to Burke for two reasons: First, that Burke was not the real inventor of the device of the patent; and, second, that the claims in suit did not involve invention in view of the prior art.

We not only are satisfied that the claims of the respective patents in suit are invalid for lack of invention over the prior art, but are content to affirm the decree of the District Court upon the general line and reasoning of the opinion of Judge Westenhaver, who presided below, except that as to the proposition that Burke was not the real inventor of the subject-matter of the patent issued to him we find it unnecessary to express an opinion. We print below Judge Westenhaver's opinion, omitting therefrom the part relating to the above-excepted proposition. In our opinion the case as to each of the claims in suit falls within the principle of cases such as Railroad Supply Co. v. Elyria Iron Co., 244 U. S. 285, 293, 37 Sup. Ct. 502, 61 L. Ed. 1136; Package Mach. Co. v. Johnson Automatic Sealer Co. (C. C. A. 6) 246 Fed. 598, 601, 158 C. C. A. 568; Huebner-Toledo Brew. Co. v. Matthews Gravity Carrier Co. (C. C. A. 6) 253 Fed. 435, 447, 165 C. C. A. 177.

The decree of the District Court is affirmed.

The following is the opinion of Westenhaver, District Judge:

Complainant's bill charges infringement by defendant of two United States letters patent, No. 783,469, issued February 28, 1905, to M. C. Schweinert and H. P. Kraft, and No. 1,253,573, issued January 15, 1918, to Wilbur B. Burke. No issue is made as to complainant's title thereto. The defenses are invalidity in view of the prior art, for lack of invention, and for lack of novelty; and, also, as to the second patent, invalidity because Burke was not the sole original inventor of the device covered by his patent application. Defendant's answer also sets up a counterclaim, charging complainant with infringing United States letters patent No. 1,094,164, issued April 21, 1914, to S. E. Nold. No issue is made as to defendant's ownership thereof, but the defense thereto is that Nold's patent is, in view of the prior art, invalid for lack of invention and lack of novelty, and noninfringement.

### Schweinert & Kraft Patent No. 783,469.

[1] The alleged invention of this patent relates to clamping devices for pneumatic tires for automobiles or other heavy vehicles. Claim 3 thereof is the only one in issue. It is as follows:

"3. In a clamping device, the combination of a nut proper having an elongated extension secured thereto, said extension being formed of sheet metal and having an internal diameter greater than that of said nut, whereby said extension is adapted to form a protecting casing for a bolt."

The patent application was filed June 3, 1904. In the early days of the automobile industry, and before the development of the clincher tire, automobile tires were held to the rim by clamping devices disposed at intervals

around the rim. A part of these devices consisted of bolts fastened at one end of the tire casing, passing through the rim, and clamped thereto on the inside of the rim with a nut. They were usually six or eight in number, and were called "stay" bolts. At present, and for many years past, excepting on racing cars, the bolt and nut have decreased in number to one which is fastened with a spreader plate or bridge, and other devices, to the inner tube of the tire, passes through the rim and is clamped on the inside with a nut. This bolt is screw-threaded, and carries the valve by means of which the tire is inflated, and is now more commonly known as a valve stem. The clamping nut performs with respect to the stay bolt and to this valve stem the same function. The difficulties of adjusting a tire to the rim require a stay bolt or valve stem of considerable length, so that it can be engaged by the clamping nut and the latter used as a sort of handle to pull down the retaining plate to its clamping position. In its final position a considerable part of the stay bolt or valve stem projects inwardly beyond the rim, and it is very desirable that the part thus exposed should be protected from dust or injury to the threads.

Complainant's contention is that, prior to this invention, combined stay bolts and caps and combined valve nuts and dust caps were made exclusively of a single piece of metal; that the method commonly employed in making combined nuts and caps was to cut the same from a hexagonal rod; that, owing to the desired length of the combined nut and cap, this, it is contended, caused a great waste of metal; and that, inasmuch as the metal then commonly used was brass, this waste resulted in a substantial loss. A further contention is that the bore of the nut must either be screw-threaded its full length, which is a disadvantage, or that it must be enlarged with an expanding tool beyond the screw-threaded section of the nut proper. This is said to be an expensive operation. The invention was designed to overcome these disadvantages, and is said to accomplish that purpose.

Complainant and its witnesses unduly exaggerate, it seems to me, the problems involved. Threaded bolts and nuts as clamping devices are simple and old in the art. They are designed for use in many situations, and are common to all arts in which threaded bolts and screw-threaded nuts need to be used as clamping devices. There is nothing unusual or out of the ordinary in the use of a bolt and nut as a device to clamp a tire to a rim. No invention, it seems to me, can be predicated upon the adaptation of nuts and bolts to this use. The invention, if any is present, in claim 3, is said to reside and must be found in the combination of a nut proper having an elongated extension secured thereto, and the formation of this extension from sheet metal with an internal diameter greater than that of the nut. Such, in brief, is complainant's contention.

Complainant's witnesses, Kraft and Volckhausen, in their testimony state that, prior to complainant's invention, screw-threaded bolts with nuts were in common use for holding pneumatic tires to automobile vehicles. The nuts were in various forms, including solid nuts, wing nuts, and a nut with a sleeve or cap made integrally from one piece of metal, as has already been stated. More pertinent to this issue, their testimony shows that nuts in combination with a separate cap or sleeve, fitting over the exposed end of the bolt or valve stem are also commonly used. This cap or sleeve, formed separately from the nut, was drawn from sheet metal, with the lower end screw-threaded on its interior side to the same diameter as that of the nut. Complainant's Exhibit No. 22 shows various forms of separate sleeves or dust caps thus used. The earliest form is that numbered 835, which had been used and was being used at and before the date of this alleged invention.

In view of this art, the inventor's problem was merely to unite this sleeve or dust cap to the nut proper. Claim 3 does not prescribe any method for making this union. The problem manifestly could be solved by removing the interior screw threads of dust cap No. 835 and connecting it with the nut by any efficient mechanical method. Unless invention is present in conceiving the idea of uniting these two, then claim 3 is invalid, otherwise it is not.

Before answering this question, the art of record should be briefly stated. United States letters patent No. 621,971, issued March 28, 1899, to Charles G.

Page, discloses a combined nut and cap used as a means of clamping a tire to a rim. The drawings show the cap, as distinguished from the nut, having a diameter greater than the diameter of the nut proper. The specifications say that, in order to conceal the stem—that is, the screw-threaded end of the bolt or valve on the inside of the rim—a cap may be arranged over the exposed end thereof, preferably formed with or secured to the nut. This is the precise idea embodied in claim 3. It distinctly says that the cap may be formed separately and secured to the nut, which is the main element of claim 3. The exact method of securing the cap to the nut disclosed in United States letters patent No. 787,578, issued April 18, 1905, to Frank Lambert, on an application filed June 21, 1902, is that used by complainant in manufacturing under its patent its later commercial device. A circular groove is provided in the top of the nut adapted to receive the lower rim of the cap, and, when the cap is inserted therein, the metal of the nut is compressed around the cap, so as to hold it permanently to the nut. This is complainant's exact way of constructing its commercial device.

All the problems with which it is contended Schweinert & Kraft were confronted and succeeded in solving are fully set up and disclosed in Lambert's specifications. Lambert points out the desirability of protecting the end of the bolt projecting through the nut from injury by corrosion or otherwise; that the cost of production may be cheapened by making the nut of metal, such as brass or steel, and the cap of another metal; that the common cap nut, if made in one piece, is very difficult to thread the full length, or to enlarge with an expanding tool beyond the screw-threaded section of the nut proper. This is complainant's contention on the basis of which invention is claimed to be present. Lambert's cap nut, it is true, was designed primarily for use in connection with water meters, but the specifications and teachings of his patent are not so limited. The cap also, as the drawings show, is spherical and circular, and not elongated; but Lambert points out therein that his invention is easily available for use with caps of other shapes. The elongation or extension of Lambert's cap would be a mere change of form, shape, or proportion, and was clearly within his contemplation and within the teachings of his patent.

Other prior art patents are cited, which I deem it unnecessary to review. Answering the exact question presented of whether or not, in view of the art shown, claim 3 involves invention, I am clearly of the opinion that it does not. Screw-threaded bolts and nuts performing the same function and used in the same connection were old clamping devices commonly used for holding tires to rims. Sleeves or caps drawn from sheet metal and used in connection therewith, but not secured thereto, were also admittedly old. The only problem was securing the elongated extension or dust cap to the nut proper. Claim 3 does not disclose or claim any mechanical means of accomplishing this use. Many means of so doing, it seems to me, would suggest themselves naturally to any skilled mechanic. Furthermore, the idea of combining a nut and cap and a means for so doing are fully disclosed in the Page and Lambert patents. The only modification required of Lambert's patent was to elongate the cap and draw the same of sheet metal in order to meet precisely the letter of the language of claim 3. The length of the dust cap or of this elongated extension is not an act of invention, but is determined by the length of the screw-threaded stay bolt or valve stem; in point of fact, Volckhausen, complainant's witness, testifies that it was determined by taking the longest bolt and the thinnest rim, and making the cap of sufficient length to inclose the projecting end.

No invention is involved in substituting one material for another. This is a matter of judgment only in selecting suitable materials. No invention is involved in changing the size, degree, or proportion of an article or device. Walker on Patents (5th Ed.) §§ 31, 41, and 41a. Securing together by common mechanical method an existing nut and an existing cap, which thereafter performed together in precisely the same way the same function previously performed by both separately, is not invention. The lead pencil case of Reckendorfer v. Faber, 92 U. S. 357, 23 L. Ed. 719, is almost an exact parallel. More inventive faculty was required to combine the India rubber eraser to the lead pencil in that case than was required to omit from the dust cap of the prior art the interior screw threads at the lower end and secure this cap

to the nut by mechanical means, and this is all the advance that claim 3 covers over the pre-existing art.

My conclusion is that claim 3 of the Schweinert & Kraft patent, No. 783,469, is invalid for lack of invention, and for lack of novelty.

### Burke Patent No. 1,253,573.

[2] The invention of this patent is said by the inventor to be one for a dust cap for valves. Claims 1 and 2 only are in issue; no contention being made that claims 3 and 4 are infringed by defendant's device. Claim 1 is as follows:

"1. A dust cap for tire valves or the like, comprising a cap portion having a polygonal foot portion with an internal shoulder above it, and having means for connecting it to a threaded valve casing or the like, said means comprising a polygonal bushing of different metal from the cap portion entering and lying within and substantially inclosed by the foot portion, and said foot portion being permanently connected to the bushing by over-lying parts of the foot portion; the article constituting a unitary structure, whereby when the cap is rotated the bushing is forced to rotate with it."

Claim 2 is precisely the same, except that it omits the feature or element that the nut or bushing inclosed in the cap portion is made of different metal from that of the cap. Claims 3 and 4 differ from claims 1 and 2 only in that the bushing or nut is formed of a plurality of parts, the exact details of which need not be stated. The defenses are: (1) That Burke was not the sole and original inventor. (2) That, in view of the prior art, this patent is invalid for lack of invention and lack of novelty.

(1) Claims 1 and 2, in view of the prior art already stated, and as clearly appears from an examination of the file wrapper history of this patent, were allowed only because of the supposedly novel method of constructing the dust cap by forming a footing with an internal shoulder above the bushing and securing the bushing therein by crimping the lower edges of the cap over the bushing. Complainant claims for this cap that its polygonal form above the foot portion is a distinct advantage, permitting the grasping thereof by hand or wrench for the purpose of securing it home. This feature, it will be noted, is not an element of claims 1 and 2, and, in view of the many forms of dust cap previously made and sold, introduced in evidence as Exhibit No. 22, it could not well be claimed as novel, nor that invention can be predicated on the mere form or shape of the dust cap. Furthermore, Burke himself, the evidence shows, had made and sold more than two years prior thereto an unpatentable dust cap of which the part above the nut was of this shape or form. * * *

(2) I am of opinion also that claims 1 and 2 are invalid in view of the prior art of combining nuts and dust caps, which, except as it relates to crimping the edges of the footing over the inclosed nut or bushing, has already been sufficiently reviewed. United States letters patent No. 692,812, issued to A. G. Anderson, shows a cap with an enlarged foot portion, polygonal in form and with an internal shoulder formed above it. It is compressed against the nut so that the cap and nut constitute a unitary structure whereby, when the cap is rotated, the bushing is forced to rotate with it. It does not, however, show the lower edges of the footing crimped around the bushing or nut. Anderson's cap nut, it is true, is dome-shaped instead of elongated, but Anderson points out that the shape of this cap may be varied as desired, and used for many purposes, and that the hole in the top thereof may, if desired, be omitted. The art already reviewed shows many elongated specimens of dust caps other than Burke's. The prior art, combined with Anderson's, leaves nothing of claims 1 and 2, except the crimping over of the lower edges of the footing.

This expedient of crimping or pressing the metal of the footing around the nut or bushing to hold it in place is a very old one in the prior art. It is shown in the following United States letters patent: Matthews, No. 212,962; Tweed, No. 319,644; Andrews, No. 376,502; Palmer, No. 796,671; and Abel, No. 949,108. Furthermore, on this hearing, a polygonal nut with an enlarged footing having a shoulder above the nut and the edges of the footing crimped around it to hold it in place was clearly proved to have been designed and used in large quantities by the Bronson-Walton Company. See testimony of witnesses Bronson, DeLloyd, and Phillips. Witnesses Thatcher and Phillips,

both skilled mechanics of long experience in the art of metal drawing and stamping, testify that it is an old and well-known expedient to insert a nut within a tube and crimp the metal around the nut to hold it in place.

The only remaining supposedly new element of claim 1 is that of making the bushing of different metal from the cap. No element of invention is involved in substituting one metal for another, but only a question of judgment in the selecting of materials, and even this expedient is shown to be old in the patent art.

Lambert's patent, No. 787,578, specifically discloses the conception of using one metal for the cap and another for the nut. Ryle patent, No. 400,414, shows a brass bushing in an iron cap. Complainant's counsel urge that, inasmuch as his cap was in the water hydrant art, it is so remote from the art under consideration as not to deprive Burke's use of the idea of patentable novelty. This contention was strenuously urged in the Patent Office, when the Ryle patent was cited against the Burke application, and was there held unsound, and that no feature of patentable novelty could be based on the use of a bushing of different metal. See paper 22, Burke patent file wrapper. An appeal was taken from this decision of the Examiners in Chief to the Commissioner, who affirmed the ruling on the authority of In re Morgan, 179 O. G. 292, quoting therefrom as applicable the ruling following: "Certain devices are common to the art as a whole because they are adapted for use in many situations." Burke acquiesced in this ruling, and accepted the patent thus modified, and is now bound thereby.

In view of this holding, the good or bad faith of defendant in making a dust cap which may be an imitation of Burke's is immaterial. It is, however, worthy of note that in February, 1915, nearly one year after Burke is said to have created his invention, he adjusted with defendant a controversy respecting the manufacture by it of dust caps, at which time the only contention was that his design patent, No. 44,082, was being infringed. He seemed then to be wholly unconscious that he had made any other invention, or was entitled to any other patent. His application, filed March 26, 1915, seems to have been made in his behalf by the complainant as an assignee.

In conclusion it may be noted that arguments other than those herein discussed have been urged upon me. They have all been fully considered, but none of them call for a different conclusion or require specific comment. Commercial success is urged in support of the validity of each of these patents. It is true all have been sold in substantial, if not in large, quantities. The question of validity being doubtful, this evidence might be of weight if it appeared that this commercial success was due to the new elements of the invention; but I am convinced that such sales as were made were the result of other considerations than the alleged invention. Business methods and license agreements have played a large part; but, more important still, the growth and development of the automobile industry, creating a wide demand, is the chief contributing factor. As to all three patents, they are examples of patents devoid of invention, for the reasons stated by Mr. Justice Bradley in Atlantic Works v. Brady, 107 U. S. 192, 2 Sup. Ct. 225, 27 L. Ed. 438, recently approved and reaffirmed by Mr. Justice Clarke in Elyria Iron & Steel Co. v. Railway Supply Co., 242 U. S. 609, 37 Sup. Ct. 16, 61 L. Ed. 525, as follows:

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant to a single party a monopoly of every slight advance made, except where the exercise of invention, somewhat above ordinary mechanical or engineering skill, is distinctly shown, is unjust in principle and injurious in its consequences.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device,

every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits in good faith."

A decree will be entered, dismissing complainant's bill, and also denying defendant any relief on its counterclaim. A proper proportion of the costs due to the introduction of defendant's counterclaim will be paid by it. The clerk will ascertain that proportion. All the remaining costs will be paid by complainant.