## FORD MOTOR CO. et al. v. OHIO STAMPING & ENGINEERING CO. et al.

### No. 5791.

Circuit Court of Appeals, Sixth Circuit.

March 18, 1932.

Frank Parker Davis and Glen E. Smith, both of Chicago, Ill. (Charles R. Halbert, of Cleveland, Ohio, Longley & Middleton, of Detroit, Mich., Rector, Hibben, Davis & Macauley, of Chicago, Ill., and Vorys, Sater, Seymour & Pease, of Columbus, Ohio, on the brief), for appellants.

H. A. Toulmin, Jr., of Dayton, Ohio (H. A. Toulmin, of Dayton, Ohio, on the brief), for appellees.

Before MOORMAN and HICKS, Circuit Judges, and NEVIN, District Judge.

HICKS, Circuit Judge.

Suit by appellees for infringement of Towers patent No. 1,322,975, applied for October 25, 1913, and granted November 25, 1919, for an "automobile side door and curtain." Claims 5 to 13, inclusive, are in issue. Typical claims 7 and 9 are printed.[1]

The defense material to what we regard as a proper determination of the case is: Lack of invention. The District Judge sustained the claims.

Towers is conclusively presumed to have had full knowledge of Pearson patent No. 855,970, June 4, 1907, claims 1, 2, and 3 of which were sustained by us in Collins et al. v. Hupp Motor Car Corporation, 22 F.(2d) 27. The Pearson patent related to automobile door curtains. In so far as it is relevant here, Pearson provided top and side curtains and a door curtain, the rear edge of which was secured to a support beyond the line of the door hinge and the front edge of which was attached to, and supported by, a vertical rod detachably secured to the door. But it was found that the curtains so arranged did not adequately protect the inside of the car against dust, wind, rain, and snow because the free vertical edge of the Pearson door curtain did not fit closely against the front fixed side curtain and the top of it did not contact with the canopy or horizontal top.

Towers' problem was to correct these faults. He proceeded as follows: He attached a strip called a "valance" to the inside of the canopy near its lower edge, and

[1] "7. In combination with a vehicle top and door, a side-curtain section mounted to swing with the door and rearwardly attached to a top member, a coacting stationary side-curtain and a spring rod attached at its lower end adjacent to the swinging edge of the door and outwardly tensioned in the plane of said door, to which rod the edge of the first-named side-curtain section is secured and adapted to be drawn taut in overlapping relation of the rod and curtain with the stationary side-curtain in the closed position of the door, substantially as set forth."

"9. In combination with a vehicle top and door, an upper and a vertical side-curtain section disposed about the door opening, a swinging side-curtain section corresponding to the door, and a resilient outwardly tensioned spring rod carrying the free edge of said swinging side-curtain section from the free edge of the door and adapted to draw the same taut in overlapping relation with respect to the upper and vertical sections when the door is swung to its closed position, substantially as set forth."

arranged it to extend horizontally across the door opening and somewhat below the edge of the canopy, and he extended the vertical free edge of the door curtain. Thus, when the door was closed, the top of the door curtain would brush the lower edge of the canopy and overlap the valance, and its swinging edge would overlap the front fixed curtain. This arrangement was an improvement, but so far Towers had accomplished nothing new. Valances for the uses indicated were admittedly old in the automobile art. Mr. Blackmore, president of both appellee companies, installed and used these strips early in 1912 when he was connected with the Citizens' Motor Car Company of Cincinnati. Towers was himself acquainted with the use of valance strips in modified forms called "laces" as early as 1912.

█ Overlapping edges for closing openings were old both generally and in the automobile art. Even Pearson preferably adjusted his door curtain so that its front edge would overlap the rear edge of the front fixed curtain. For supporting the vertical swinging edge of the door curtain, Towers, following Pearson, used a rod, but he adopted a more flexible one. He fashioned it out of $\frac{3}{8}$-inch cold rolled steel. In the claims in suit this rod is variously denominated as "a resilient rod," "a spring rod," and "a supporting rod." Towers' idea was that, when this resilient or spring rod was "outwardly tensioned in the plane of the door," its pulling or drawing power would tauten the attached curtain and engage it smoothly with the valance, and that the front vertical edge would be extended in its overlapping relationship with the front fixed curtain. Obviously this result would follow, but resilient rods are not new. As pointed out by the Patent Office Examiner, all rods have resilience; the degree of their springiness depending largely upon length, composition, and form.

Mr. Brown, appellants' expert, demonstrated before the District Court that even the Pearson rod was somewhat flexible. It is common knowledge that a perpendicular rod secured at its base is resilient in every vertical plane, and by the application of force may be tensioned in any desired plane, and that its pulling power depends upon its resilience and the force applied.

█ We think that Towers' smoothly stretched side curtain, although an improvement upon Pearson, sprang from an obvious application of simple mechanical principles, generally known rather than from inventive thought and that overlapping it upon the valance and upon the front fixed curtain (both of which arrangements were old) exemplifies nothing more than the work of a competent mechanic. We have no doubt that the Towers' construction as a whole was an improvement and was preferable to anything before it, but we regard it as a betterment in degree and adjustability only. The same observation applies to the claims wherein not only the door curtain but the rod itself is made to overlap the front fixed curtain. See Railroad Supply Co. v. Elyria Iron & Steel Co., 244 U. S. 285, 286, 37 S. Ct. 502, 61 L. Ed. 1136; Adams v. Galion Iron Works & Mfg. Co., 42 F.(2d) 395, 397 (C. C. A. 6); Directoplate Corp'n v. Donaldson Lithographing Co., 51 F.(2d) 199, 204 (C. C. A. 6); Paquette v. Potter Mfg. Co., 46 F.(2d) 271, 272 (C. C. A. 6); Ohio Galvanizing & Mfg. Co. v. Mercury Mfg. Co., 49 F.(2d) 895, 896 (C. C. A. 6).

We are not unmindful that the Towers' construction has been commercially successful, but we do not regard the case as one wherein commercial success will turn the issue in favor of patentability.

The decree is reversed, with instructions to enter a new decree dismissing the bill for lack of invention in the claims in issue.