## LYMAN GUN SIGHT CORPORATION v. REDFIELD GUN SIGHT CORPORATION.

### No. 10382.

District Court, D. Colorado.
Nov. 14, 1935.

Carle Whitehead, Albert L. Vogl, and Frank A. Wachob, all of Denver, Colo., and James S. Stewart, of Boston, Mass., for plaintiff.

Ivor O. Wingren and Otto Friedrichs, both of Denver, Colo., for defendant.

SYMES, District Judge.

The plaintiff, a Connecticut corporation, charges the defendant, a Colorado corporation, has infringed United States letters patent No. 1,901,399, relating to gun sights, application filed February 25, 1930, and granted March 14, 1933, to the plaintiff corporation as assignee of Charles E. Lyman, Jr., patentee. A copy of the patent is attached to the bill.

It is alleged that sights made according to the invention have been sold by it in very large and increasing quantities, and that the defendant has been and is now infringing said letters patent by selling in Colorado and elsewhere, sights made in accordance with the plaintiff's invention. The usual relief is prayed for.

The amended answer admits the granting of plaintiff's patent and that it has for many years sold and manufactured gun sights and is now so doing, but denies that the sights sold and manufactured by it infringe. For a second defense the defendant alleges the patent in suit is invalid because it does not constitute patentable knowledge, and that the alleged inventions and improvements claimed by the said Charles E. Lyman, Jr., were, more than two years prior to his application, patented or described in several patents, American, German, and British, listed in the answer.

The art involved concerns gun sights for rifles generally, but more particularly the delicate and accurate front sights used in target shooting, as distinguished from game shooting. They may be classed as hooded sights, used almost exclusively by expert shooters competing in tournaments, by members of national teams taking part in international competitions, etc.

The hooded sight consists of a convenient hollow steel cylinder, roughly an inch to an inch and a quarter long, with a diameter of one-half to three-quarters of an inch, within which the sighting element proper, denominated an insert or reticule, is positioned. Inserts are old in the art, are of various types, made of very thin metal, and consist mostly of a circular edge portion of sufficient diameter to fit conveniently into the diameter of the hood, together with an interconnecting member extending inwardly radially from this edge portion to the center sighting portion. The latter may be what is known as a post, aperture, cross-hairs, bead, etc. The hood excludes light, except from the front and rear. Open sights used in hunting, etc., with which we are not here concerned, do not have hoods.

. The objective of workers in this field has been an assembly wherein various

types of inserts may be rigidly supported and accurately positioned within a relatively long protecting light-excluding hood, and yet be readily removable and interchangeable without the use of tools.

Needless to say, the art is a crowded one, and has engaged the attention of inventors, experts, and manufacturers for many years before this patent, or the manufacture of sights by the parties here concerned began. No radical improvements have been disclosed for many years, nor are any involved in plaintiff structures.

The disclosure of plaintiff's patent No. 1,901,399, referred to in the record as the Lyman 17–A sight (Exhibit 2), relates to a hooded type front sight, wherein a plurality of interchangeable reticules are provided, and the sight adaptable to various kinds of light conditions and styles of targets, without affecting the sight adjustment of the firearm; the inserts being rigidly supported within the hood, which acts as a shield and excludes the entrance of light except through the ends.

The bore of the hood has a counterbore for half its length, providing a radial interior shoulder. This counterbore is threaded so as to receive a hollow cylinder plug, likewise threaded, which is readily grasped by the fingers and screwed into the hood. The reticules are made of relatively thin steel of ring-like shape, having an external diameter to closely fit the counterbore portion of the hood, with two small radially extending arms or ears on the periphery. When a reticule is inserted in the counterbore end of the hood, these arms are received into two narrow, axially directed horizontal slots cut into the hood for half its distance. The reticule is thus conveniently inserted. The plug is then screwed in, pushing the reticule forward until it is securely clamped and rigidly held in place against the shoulder. The ears project beyond the periphery of the hood sufficiently to permit the reticule being grasped in the fingers. The ears being positioned in the slots, cause the posts or apertures of the reticule to be held in a vertical position for use without further attention or adjustment. The plug closes the slot openings and prevents the entrance of light.

Interchangeable disk sights are admittedly old, as disclosed by the Winchester yoke interchangeable disk sight, in general use as early as 1882 (Exhibit K).

This was followed by the old Lyman 17 sight (Exhibit 24), put out by Lyman and described in their catalogue in 1902 (Exhibit 22). These two dominated the field up to 1929, when the Lyman 17–A was put on the market. It was favorably received by those interested and has been a commercial success.

## Infringement.

The first of the defendant's products designed by Redfield (Exhibit 16), was put on the market in 1925, followed by others in 1932, and had some success and use. In 1933 the defendant began selling its so-called vertical slot design (Exhibit 3), which was immediately protested by Lyman as an infringement, following which, with knowledge of the Lyman 17–A, the defendant changed to the so-called inclined slot form (Exhibit 5). These types constitute the alleged infringements.

Exhibit 3 consists of a hollow cylindrical hood designed to hold inserts, having a generally circular peripheral portion adapted to closely fit within said hood. The insert has two small arms of unequal width extending radially from its periphery. The hood has a narrow vertical transverse slot extending halfway into the hood, into which the insert is placed, the small arms of which engage the slot as it drops into position. At the lower end of the transverse slot are very short horizontal slots to receive the arms of the insert. A screw plug, similar to that described in 17–A, is screwed horizontally into the hood, moves the insert into the very short horizontal slot and clamps it securely into a vertical position against a circular shoulder within the hood. The ears described extend beyond the periphery of the hood, and may be conveniently grasped by the fingers to insert or remove the reticule.

After the protest by Lyman Redfield changed this design by slightly inclining the transverse from the vertical (Exhibit 5). Otherwise the construction is the same. These two exhibits disclose all the elements of plaintiff's claims, excepting only the manner of inserting the reticule into the hood. Patently, placing the insert in position in the hood by means of a vertical, or near vertical slot, instead of the Lyman horizontal slots, is a minor alteration that would readily occur to any one skilled in the art, and is an obvious attempt to avoid the Lyman

claims. Both Exhibit 3 and Exhibit 5 employ minute horizontal slots to enable the screw plug to move the reticules from the vertical slots, and clamp them securely in a vertical position against the shoulder exactly as Lyman does.

The horizontal slot and the engagement of the arms therein are necessary to prevent rotary movement of the insert relative to the hood. Otherwise the positioning of the post or aperture of the insert might be off the vertical. Horizontal slots are a major element of Lyman.

Both devices employ substantially the same methods and arrive at the same result. I therefore find that the defendant's devices (Exhibits 3 and 5), infringe all the claims of the Lyman patent, including 4 and 7, admitted by defendant to be infringed, except claims 5 and 6, which counsel agree are not here in issue.

### Anticipation.

At the start of this discussion, it must be borne in mind that a function is not patentable.

"It is elementary that the mere function of a machine is not patentable, but that the claims of the patent must be construed in the light of the specifications and drawings to which they relate, and are not to be given an interpretation so broad as to cover the function of the machine patented, and thus protect against every possible machine with a like function." Ottenheimer Bros. v. Lebuwitz (D.C.) 5 F.Supp. 205, at page 208.

As early as 1882 the Winchester Arms Company advertised and put on the market what is described as an interchangeable disk sight (Defendant's Exhibit K). This construction has a circular hollow hood and a vertical transverse slot extending from the top to the bottom of the hood, into which the common post type reticule is inserted. The lower side of the reticule has a horizontal base which, when positioned in the slot, rests upon a flat surface at the bottom below the hood and automatically takes the proper position. A spring clamp on the outside of the hood holds it securely in place. The insert, being easily removable, anticipates Lyman in this respect. True, this Winchester assembly uses a vertical slot, while Lyman's slots are horizontal —a difference, however, which, as already pointed out, is of minor importance. Furthermore, like in Lyman, the reticule is automatically positioned and excludes the entrance of light through the slots.

Exhibit Y, described as a reticule holder assembly for the Winchester telescopic sight (of which Exhibit O is an enlargement), is also a Winchester product, manufactured, used, and known since 1910. It discloses a short, hollow hood, through one end of which a circular reticule is inserted horizontally, and pushed forward against an interior, circular shoulder. The insert is the usual Lyman type, except it has but one ear or arm that engages a single, horizontal slot extending part way into the hood, and automatically positions it in place. The insert is held in position by a round, hollow ring of sufficient diameter to slide into the hood behind the insert, and hold it against the shoulder. This ring is in turn held securely in position by a screw that screws into the ring through the horizontal slot. A vertical transverse slot in the hood, together with the horizontal slot described, permits two wings of the hood to expand so as to conveniently receive the ring and permit its removal. This device employs the elements, conveniently removable inserts, a horizontal slot, and the automatic vertical positioning of the reticule. This assembly is used as the sighting member of the Winchester telescopic sight. It is a part of the telescopic construction that consists of a comparatively long circular hollow hood that houses the telescopic lenses and their parts in addition to this sighting element. For this reason, the plaintiff argues that as thus used it does not anticipate the Lyman 17–A sight.

I cannot follow this argument. True, it is only part of the complicated telescopic assembly, nevertheless it is the exclusive sighting element thereof distinct and apart from the telescope proper, which magnifies the field of vision and the target, but requires a sighting element. Moreover this sighting element can be used separately as a hooded sight, embodies the principal of the horizontal slot, the usual type of interchangeable reticule automatically positioned by an ear, and a means for holding it firmly in position against a shoulder.

Wanee's gun sight, No. 912,050, patented February 9, 1909, employs a hollow cylindrical hood having a circular peripheral portion or plug adapted to screw

part way into said hood in a manner similar to Lyman, an annular shoulder and removable transparent partitions or inserts of glass, mica or the like, held in position against the shoulder by the plug. The inserts employed by Wanee have a white or black bead in the center. No means for preventing rotary movement of the insert relative to the hood are disclosed, probably because none is necessary with the type of insert used. This patent was considered by the Patent Office when passing upon the Lyman patent, yet it would seem to anticipate one or two, at least, of the elements thereof.

The Maynard patent, No. 318,999, issued June 2, 1885, discloses the transverse slot, and employs an insert with radial arms, designed to engage the slot, and, like Lyman, to automatically position the insert when in place.

The Irion patent, No. 1,387,787, dated August 16, 1921, provides for the insertion of the insert through the end of the usual horizontal tubular hood, with an inner circular sleeve adapted to slide into the hood, and held in engagement therewith by frictional contact against accidental displacement. Four horizontal slots in this inner sleeve are used to receive the sight wires, which cross at the axis of the sleeve. The cross-wires are the sighting element, and are not automatically positioned.

Carlson in his patent, No. 539,470, dated May 21, 1895, shows a circular tubular member adapted to be inserted in, and removed from a larger cylinder hood with two radial arms, called flanges, extending beyond the periphery of the hood, designed to "limit the inward movement of said sight in said holder," and "by which the sight may be gripped for purposes of moving."

Maynard likewise employs arms extending radially beyond the periphery of the hood.

If I have described these constructions correctly, they disclose anticipation of every element of the Lyman claims in suit, with the exception, perhaps, of variations that are too minor and obvious to be patentable.

Counsel for plaintiff rely upon the rule that a new combination, accomplishing a new and useful result, is patentable, even though every element is old. Citing Stearns-Roger Mfg. Co. v. Ruth (C.C.A.10th) 62 F.(2d) 442, and other authorities. I fail to see, however, wherein the Lyman construction accomplishes a new and useful result. The only advance disclosed is, perhaps, that the insert is to some extent more conveniently removed, and more securely and automatically positioned. To a marksman looking through the sight it is the same as many of the other designs. It employs exactly the same types of reticules or beads, which after all is the main objective of all gun sights. It is the same in respect to the admission and exclusion of light. The advantages claimed, such as the automatic positioning of the reticule, its secure clamping against an interior shoulder by means of a screw bushing, and a reticule with arms extending outside the periphery of the hood, so as to enable it to be conveniently grasped by the fingers, and the horizontal slots, are all old and anticipated. It lacks the elements of "some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts." Atlantic Works v. Brady, 107 U.S. 192, at page 200, 2 S.Ct. 225, 231, 27 L.Ed. 438.

Admittedly Mr. Lyman is unusually skilled in the art and experienced in the manufacture of sights, as well as an expert marksman. It may well be that Lyman's construction discloses an advance in the art not heretofore known, in that it more rigidly supports and accurately positions the reticules and facilitates their replacement. Nevertheless, the fact remains that the same objective and result, to a less degree of perfection perhaps, is disclosed in the anticipations, and even though Lyman has done a better job than the others, he has not reached that "originality of conception, which springs spontaneously, and not 'by a necessity of human reasoning in the minds of those who became acquainted with circumstances with which they had to deal.'" Tiemann v. Kraatz et al. (C.C.A.) 85 F. 437, at page 439.

And in Altoona Public Theatres v. American Tri-Ergon Corp., 294 U.S. 477, at page 486, 55 S.Ct. 455, 459, 79 L.Ed. 1005: "However skillfully this was done, and even though there was produced a machine of greater precision and a higher degree of motion constancy, and hence one more useful in the art, it was still the product of skill, not of invention."

■ Lyman has achieved commercial success, but this can only be considered in doubtful cases. According to the record, the plaintiff company, by reason of its efficient organization and contacts with the trade, was able to secure a wide market and distribution of its product, as evidenced by its adoption by the Winchester Arms Company, who thereafter ceased to manufacture sights. Commercial success, according to Steel & Tubes, Inc., v. Greenpoint Metallic Bed Co. (C.C.A.) 37 F.(2d) 172, at page 175, "obviously may result from a multiplicity of causes. Hence to assert with confidence that commercial success bespeaks invention requires that all other causes be eliminated."

And in McClain v. Ortmayer, 141 U.S. 419, at page 428, 12 S.Ct. 76, 79, 35 L.Ed. 800: "That the extent to which a patented device has gone into use is an unsafe criterion, even of its actual utility, is evident from the fact that the general introduction of manufactured articles is as often effected by extensive and judicious advertising activity in putting the goods upon the market * * * as by the intrinsic merit of the articles themselves."

In a very late, if not the latest, discussion of patent law by the Supreme Court, Paramount Publix Corp. v. Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997, the court below had held that the voluminous evidence showing the practical utility and widespread use of the patented process was sufficient to establish invention. The court says, 294 U.S. 464, at page 474, 55 S.Ct. 449, 453, 79 L.Ed. 997: "It is said that, however simple and obvious the method may appear to be now that it is in successful use, no one before the patentees had used it for producing the union of a sound and a picture record. * * * These considerations, it is urged, should turn the scale in favor of invention." And after stating it is only in doubtful cases that advance in the art may be thrown in the scale (citing De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 685, 51 S.Ct. 563, 75 L.Ed. 1339), said this, 294 U.S. 464, at page 474, 55 S.Ct. 449, 453,

79 L.Ed. 997: "Evidence of utility and prompt acceptance of the patented method, in the circumstances of this case, adds little weight to the claim of invention."

And, 294 U.S. 464, at page 473, 55 S.Ct. 449, 453, 79 L.Ed. 997: "This use of an old method to produce an old result was not invention. * * * To claim the merit of invention, the patented process must itself possess novelty. The application of an old process to a new and closely analogous subject-matter, plainly indicated by the prior art as an appropriate subject of the process, is not invention."

And in the companion case, Altoona Public Theatres v. Tri-Ergon Corp., 294 U.S. 477, at page 486, 55 S.Ct. 455, 458, 79 L.Ed. 1005, the court said: "An improvement to an apparatus or method, to be patentable, must be the result of invention, and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art."

■ A careful examination of the various models discloses a marked similarity in all. The most that can be claimed for anyone, including the plaintiff, is that of a different form or combinations of well-known elements, without any new functions, or the accomplishment of any new result. This does not amount to invention. Railroad Supply Co. v. Elyria Iron & Steel Co., 244 U.S. 285, at page 292, 37 S.Ct. 502, 505, 61 L.Ed. 1136, wherein the court said: "The 'mere carrying forward of the original thought, a change only in form, proportions, or degree, doing the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent.' "

■ These authorities are applicable to the case at bar and convince us that the Lyman claims in suit lack novelty, are anticipated, and the patent cannot be sustained. It follows that the bill should be dismissed, and the defendant recover its costs.

Counsel may submit proposed findings of fact and conclusions of law agreeable to these views.