## SCHREYER et al. v. CHICAGO MOTO-COIL CORPORATION et al.

### No. 7433.

Circuit Court of Appeals, Seventh Circuit.

March 6, 1941.

A. L. Morsell, Jr., and Curtis B. Morsell, both of Milwaukee, Wis., for appellants.

Maurice S. Cayne, of Chicago, Ill., for appellees.

Before SPARKS and MAJOR, Circuit Judges, and BALTZELL, District Judge.

SPARKS, Circuit Judge.

Appellants charged appellees with infringement of United States patent No. 2,178,512 to Schreyer. The patent was issued October 31, 1939, on an application filed October 3, 1938. Steam-O-Matic Corporation has the exclusive license to make, use and sell throughout the United States the alleged improvements described in the patent. The individual defendants, Holger Thielgaard, Ted Thielgaard and R. C. Masters, respectively President, Vice-President, and Secretary-Treasurer of the defendant company, were made defendants on the ground that they were using the insolvent

---

company as a shield for a willful and flagrant infringement. The defenses were invalidity and non-infringement. The defendants also filed a counterclaim in which they charged appellants with unfair competition. The appellees admitted, and the court held, that the patent was infringed if valid, but the court held that each of the four claims was invalid. The court at the conclusion of the evidence dismissed the complaint as to the individual defendants. It thereafter dismissed both the complaint and the counterclaim for lack of merit and assessed one-half of the costs to each party. The appeal is from this decree.

The alleged invention relates to electric irons, and is more particularly directed to a combination electric iron and dampener. We learn from the specification that its chief objects are the provision of an iron and dampener having a water container secured to the shoe of the iron, which container overlies the entire surface of the shoe; a plurality of baffles in the container to prevent the water from surging; a cover sealed to the container and having a steam chamber or dome at the forward end thereof, provided with baffles therein; a continuous channel in the shoe of the iron into which the steam is discharged from the dome for an even distribution to outlet openings arranged in the shoe and communicating with the channel; a support for setting the iron on its heel; and thermo-responsive means for cutting off the current to the heating element at a predetermined degree of heat.

The base or shoe of the iron may be of any suitable material, preferably aluminum. The shoe is provided on its top surface with a continuous channel at its forward end, and a relatively large depression extending from a point adjacent the channel to near the heel of the shoe. The channel has a plurality of perforations therein, providing discharge outlets to the under surface of the shoe, and the depressed portion is adapted to receive an electrical heating element therein. A filler pad of asbestos, or other suitable material, is placed over the heating element and is provided with a plurality of perforations. The container is secured to the shoe and is provided with a bottom wall which forms an enclosure or top wall for the continuous channel, and engages the filler pad to retain the heating element in position. The container is preferably constructed of an aluminum casting and is secured to the shoe by means of cap screws which draw the bottom wall

of the container into contact with the filler pad, to retain the element in position and to cause the bottom wall to engage the shoe to form an enclosure for the heating element and channel. The cap screws extend through the bottom wall of the container, and head portions are provided with internal threads for securing a cover to the container.

When the container is in fixed position on the shoe, it engages the periphery of the shoe to form a perfect enclosure for the heating element and channel, and its contact with the pads serves to conduct the heat through the container. The container is also provided with a plurality of baffles which extend from the bottom wall and are disposed angularly with their top edge portions directed toward the rear of the container.

The cover of the container is provided with serrations along its lower edge which coact with corresponding serrations on the top edge of the container. Two bolts extend through the cover into the threads provided in the heads of the cap screws and these bolts serve to retain the cover in sealed position with the container. The cover is preferably a casting, with a steam chamber or dome, cast integrally therewith, and an upwardly extending lug, at the extreme ends of which a metal grip is secured therebetween by a bolt.

The dome is preferably provided with a plurality of angularly directed oppositely positioned baffles which are arranged to provide a central opening through which the upper end of a pipe is directed, which pipe has its lower end secured in the threaded head of a hollow cap screw, which in turn extends through the bottom wall of the container and is threaded into the shoe. This cap screw serves to securely retain the forward end of the container in position, and it also serves as a means through which the steam is exhausted from the pipe into the continuous channel of the shoe. There is an annular recess in the bottom wall which provides an opening above a depressed portion that communicates with the continuous channel in the shoe. The cap screw is provided with a plurality of transverse openings that communicate with the annular recess of the container for directing the steam from the lead pipe into the channel.

The cover has a screw cap opening for filling the container with water. The heating element has the usual electric con-

nections. The current used to heat the shoe also heats the water. After the water is heated to the boiling point the steam will rise into the dome and when under sufficient pressure will be forced through the lead pipe to the hollow cap screw and outwardly of the transverse openings into the continuous channel and perforations. When the steam is thus admitted, it circulates therearound and is evenly distributed through the series of perforations to the under side of the shoe.

During the ironing movements, the water is withheld against surging action by means of the baffles, or a metal wool which may be placed between the baffles. In order to admit the passage of water from one compartment to another, a plurality of openings is provided in the baffles adjacent the bottom wall of the container.

As the dome is positioned at the forward end of the iron, the iron may be set up on its heel while heating, and also for steaming purposes, and in order to support the iron on its heel a bracket is provided.

The patent has four claims and each is relied upon.[1]

[1] "1. An iron comprising a base plate having openings therein providing steam outlets, a container for water above the base plate, the walls of which form the main body of the iron, said container extending throughout the major portion of the length of the base plate, there being a steam space in the upper portion of said container within which steam is generated, a duct leading from the steam space to the outlet openings of the base, means for heating water in said container to produce steam, and means at the rear of the iron for holding the iron in spaced relation from a support when the iron is in operation to provide for standing of the iron on its rear end, said steam space being at a forward portion of the water container with the inlet end of the duct therein above the normal water level when the iron is standing on its rear end whereby rising steam free from water will be discharged through said duct while the iron is standing on its rear end.

"2. An iron comprising a base plate having openings therein providing steam outlets, a container for water above the base plate, the walls of which form the main body of the iron, said container extending longitudinally of the base plate, there being a steam space in an upper portion of said container, a duct leading from the upper portion of said steam space to the outlet openings of the base plate, means for heating the water in said container to produce steam, means at the rear of the iron for holding the iron in spaced relation from a support providing for standing of the iron on its rear end, said steam space being at the forward portion of the water container and the inlet opening of the duct therein being above the normal water level when the iron is standing on its rear end whereby rising steam free from water will be discharged through said duct while the iron is standing on its rear end, and a transverse baffle rearwardly of the steam space terminating short of the top of said container, said baffle being inclined rearwardly to cause quick drainage of water to the rear part of the water container when the iron is standing on its rear end.

"3. An iron adapted for either horizontal or vertical use comprising a shoe formed with steam perforations, a container for water above the shoe and substantially coextensive therewith, there being a steam space in an upper portion of the container, a duct leading from the steam space to the steam perforations of the shoe, a layer of metal wool in said container of sufficient thickness and so positioned as to prevent surging of water into the steam duct during normal use, said wool being nonabsorbent to permit the water to flow from one part of the container to another when the iron is changed from one position of use to another, and means for heating the water in the container to produce steam.

"4. An iron comprising a relatively thin shoe formed with steam perforations extending therethrough and with a steam recess in its upper face communicating with said perforations, a container for water above the shoe, the bottom of the container having a recess in its lower surface communicating with the steam recess of the shoe, there being a screw receiving portion of the shoe having a thickness approximately equal to the maximum thickness of the shoe located below the recess which is in the bottom of the water container and overlapped by said recess which is in the bottom of the water container, a cap screw extending through the container bottom and through said recess in the container bottom and threaded into said screw receiving portion of the shoe, said cap screw having a duct therein communicating with the recess in the bottom of the container, means for conducting steam from the upper portion of the water container to the cap screw duct, and means for heating water in the container to produce steam therein."

Appellees rely upon the following patents in support of the lower court's ruling on the question of validity: Slonaker, No. 1,683,145; Butman, No. 1,697,224; Izumiya, No. 1,830,875; Schaefer, No. 1,962,940; Skolnik, No. 1,696,583; Deems, No. 2,027,767; Quertainmont, No. 38,162 (French), and Hirigoyen, No. 330,870 (British). All of these patents, save Butman and Schaefer, were cited by the Patent Office.

Claim 1 comprises six elements: (1) A base plate having openings therein providing steam outlets; (2) a container for water above the base plate, the walls of which form the main body of the iron, said container extending throughout the major portion of the length of the base plate, there being a steam space in the upper portion of the container within which steam is generated; (3) a duct leading from the steam space to the outlet openings of the base; (4) means for heating water in the container to produce steam; (5) means at the rear of the iron for holding it in spaced relation from a support, when the iron is in operation, to provide for standing of the iron on its rear end; and (6) the steam space being at the forward portion of the water container with the inlet end of the duct therein above the normal water level when the iron is standing on its rear end.

It is urged by appellees that all of these elements except number 5, the bracket disposed at the rear to permit the iron to stand on its rear end, are met in the patents to Izumiya and Slonaker.

In this respect appellants contend that Izumiya has no base plate except the bottom of the water container, that this iron might produce steam, but that in passing up through the elevated neck it would recondense so that drops of water would emerge with the steam; that there is no way of heating the base plate for pressing purposes, because the heating element is entirely surrounded by water and the maximum temperature of water is 212 degrees F., whereas temperatures of 300 degrees F., or more, are necessary for pressing. Appellants further urge in this respect that if this iron were so constructed as to stand on end, the water in the front of the iron would flow into the steam chamber and would spout out of the steam outlet.

With respect to the Slonaker patent, appellants urge that it could not function while in a vertical position because the water in the main body would flow into the steam dome and would spout out through the pipe and the openings in the bottom. They urge that this iron contains no inclined baffles, or anything that is similar to metal wool. However, claim 1 discloses neither baffle nor metal wool.

We think the lower court did not err in holding claim 1 invalid in view of Izumiya. Claim 1 is quite broad in its disclosures and it is for this reason that we think it is invalid. It is quite true that Izumiya used the bottom of his water container for a base plate, but we think this makes no difference. If the latter construction, for which a patent was previously granted, performs the same function as does Schreyer who used a separate base plate and a separate water container, it would seem that Schreyer had employed nothing more than mechanical skill, although thereby he might have made an improvement over Izumiya. This, however, would not permit him to use as his own the disclosures of Izumiya, and we think he did. Appellants have doubts as to whether Izumiya's device will work because of lack of heat and condensation. We are not impressed with this argument. We think it would not work so well as Schreyer's device, but this fact would not permit him to copy Izumiya's disclosures. It may be true that Izumiya did not intend that his iron should be set up on end, nevertheless, it can be by using the receiving socket of the electric connection for the same purpose as Schreyer's bracket which is described as the fifth element of appellant's claim 1. However, if this is done, appellants urge that the water in the front of Izumiya's iron would flow into the steam chamber and spout out of the steam outlet. This might be true were it not for the baffles which Izumiya claims and uses. In any event the water would likewise flow into the steam chamber of Schreyer under claim 1, because no baffles are disclosed in this claim. Aside from Izumiya's baffles, claim 1 now before us would read upon Izumiya, and the latter, if later, would certainly infringe claim 1.

Claim 2 includes all the elements of claim 1, and adds a transverse baffle rearwardly of the steam space terminating short of the top of the container, which baffle is inclined rearwardly. In Izumiya the baffles are not inclined rearwardly but they are used for precisely the same purpose as those of Schreyer. In Izumiya both baffles are cut away adjacent their bottom and upper ends for the purpose of dividing the interior of the body into compartments in order to prevent splashing of water within

the iron while it is in use. It is worthy of note that if it is desired to stand Izumiya on end, the water will be quickly drained to the rear part of the water container. The District Court obviously thought that it was not invention to rearwardly incline the baffles as a substitute for the cut-aways at the bottom and upper ends of Izumiya's baffles. If our judgment were inclined to the contrary we would not feel justified in substituting our judgment in this respect for that of the lower court. Especially is this true where inclined baffles are shown to be old in the art in Slonaker and in Deems.

The third claim of the patent differs from claim 1 in that it calls for a layer of metal wool in the container, in sufficient thickness, and so positioned, as to prevent surging of water into the steam duct during normal use, and also to permit the water to flow from one part of the container to another when the iron is changed from one position of use to another. Appellees contend that this claim is invalid, not only because it is fully anticipated in the prior art, but because it is indefinite and functional. To support this contention they rely upon Izumiya, Slonaker, and also Hirigoyen.

Hirigoyen provides for the use of a material disposed in the water container to prevent the surging of water into the steam duct. It discloses an electric iron having a shoe formed with steam perforations, a container for water above the shoe, which container is filled with a material which keeps the liquid stationary to thereby permit the iron to be placed in all positions without objection. The material specified by him for this purpose is either asbestos, wadding, fire-proofed cotton or silicated cotton, porous porcelain, a mixture of plaster or infusible earth or any other suitable material, preferably incombustible. Appellants urge that this patent is an impractical foreign patent which would fail completely to function, but there seems to be no evidence in the record to support that statement and we observe none. It is true that Hirigoyen does not specify metal wool, and obviously he prefers an absorbent, but he includes any other suitable material, which, of course, might reasonably include steel wool. The use of metal wool for this purpose is shown to be old by Skolnik, and if Schreyer is new it must be by virtue of the fact that he discloses a true combination of old elements of which metal wool is one.

Appellees further urge that claim 3 is invalid on the ground that it is functional and indefinite, in this, that it calls for a layer of metal wool of *"sufficient thickness"* and *"so positioned."* There is nothing in this specification or claim which in any way defines what thickness of metal wool is used, or how it should be positioned in order to accomplish the purpose for which it was intended. The only reference aside from claim 3, is found in the specification: "During the ironing movement of the iron, the water contained within the container is withheld against surging action by means of the baffles *or* a metal wool may be placed between the baffles." Nothing is stated as to the amount or thickness of the layer of metal wool or as to how it is to be positioned. Appellees also suggest that specifications indicate that either baffles or metal wool were intended to be used. We do not accept this interpretation. The use of baffles is not disclosed in claim 3, but we think the specification clearly discloses the use of metal wool between the baffles. We are convinced that the claim is insufficient for indefiniteness. It is obvious from the claim that there should be a layer of metal wool in the container, and of course a layer without support must necessarily rest on the bottom of the container. To be sure, the exact thickness of the layer is not designated, but it is to be of such thickness as to prevent surging of the water into the stream duct during normal use. To a lay mind this would mean that the thickness of the layer should be determined by trial and error and we think one skilled in the art would so consider it, and have no difficulty in producing the disclosure.

Claim 4 differs from the other claims in that it recites a number of details of construction which, in our judgment, do not cooperate with or modify the operation of each other, all of which seem to be anticipated in the prior art and define nothing more than the exercise of mechanical skill.

The file history clearly indicates that the catch screw used for securing the water container to the shoe, and at the same time permitting the discharge of steam from the dome to its discharge openings in the sole plate, was the element which caused the allowance of this claim. The French patent to Quertainmont discloses a similar screw, used for the same purpose, and substantially identical in construction with the cap screw of Schreyer. There is greater similarity here than there is between Schreyer

and the patent in suit. These means in both the French patent and Schreyer are used for connecting the water container to the sole plate of the iron. Both are provided with ducts to permit communication between the top of the water container and the outlets in the sole plate.

We think it cannot be denied that all of Schreyer's elements were quite old in the art, and that all of the claims were fully anticipated by the prior art. We are of the further opinion that each of the elements contained therein when used by Schreyer in combination produced no new result which amounted to invention. It is quite true that most of the prior art patents here relied upon were considered by the Patent Office, but we think the anticipation here is so clear as to make our duty quite plain. A device to be patentable must not only be new and useful but must involve the exercise of inventive faculty which to us seems absent here. A mere carrying forward of new or more extended application of the original thought, a change only in form, proportions or degree, the substitution of equivalents doing substantially the same thing in the same way, by substantially the same means with better results is not such invention as will sustain a patent. See Smith v. Nichols, 21 Wall. 112, 88 U.S. 112, 22 L.Ed. 566; Railroad Supply Co. v. Elyria Iron Co., 244 U.S. 285, 37 S.Ct. 502, 61 L.Ed. 1136; Monckmeier v. Erie Mfg. Co., 7 Cir., 98 F.2d 369; and Higby v. A. B. T. Mfg. Co., 7 Cir., 93 F.2d 73.

[4] There is no doubt that the device has had considerable commercial success which might indicate that Schreyer was entitled to a patent for a combination of old elements, producing no new result, but producing it in a more facile, efficient and economical manner. The record here, however, is not convincing that this commercial success was due to the elements disclosed in these claims. Since the patent was issued, appellants have incorporated in their later models certain features which are not covered by these claims. It is quite conceivable that these might have been responsible for the commercial success rather than the disclosures of the claims. It is obvious that the District Court was of that opinion, and we are not inclined to disturb his conclusion in this respect. There was no error in dismissing the complaint as to the individual defendants, nor in dismissing appellees' counterclaim.

We approve the findings and conclusions of the District Court and the decree is affirmed.