**ALLEN–BRADLEY CO. v. SQUARE D. CO. (two cases).**

**Nos. 9017, 9018.**

Circuit Court of Appeals, Seventh Circuit.

March 6, 1948.

Rehearing Denied June 29, 1948.

Edwin B. H. Tower, Jr., of Milwaukee, Wis., and Carlton Hill and Samuel W. Kipnis, both of Chicago, Ill. (Victor Beam, of New York City, of counsel) for Allen-Bradley Co.

J. Bernhard Thiess, Sidney Neuman and M. Hudson Rathburn, all of Chicago, Ill. (Myron J. Seibold, of Detroit, Mich., of counsel), for Square D Co.

Before MAJOR and KERNER, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

These appeals are from a judgment, entered August 15, 1945, in a patent infringement suit. In appeal No. 9017, plaintiff appeals from that part of the judgment dismissing its complaint, while in No. 9018, defendant cross-appeals from that part of the judgment in dismissing its counterclaim.

The plaintiff Allen-Bradley Company on June 3, 1938 filed its complaint charging infringement of Letters Patent No. 2,071,-149 (subsequently referred to as patent '149), issued August 17, 1937, upon an application filed July 11, 1935, which contained thirty-one claims, only seven of which are involved in this suit, and upon Wilms and Petersen Reissue Patent No. 20,676, issued March 22, 1938, upon an application filed February 9, 1938, containing six claims, only one of which is now relied upon. The District Court held these claims of both patents invalid, and it is

from this holding that Allen-Bradley appeals in No. 9017.

The defendant Square D Company, on March 30, 1939, filed a counterclaim charging plaintiff with infringement of claims 31 to 36, inclusive, of its Jackson Patent No. 2,143,697, issued January 10, 1939, upon an application filed December 27, 1934. The defendant, also, on January 27, 1941, filed another counterclaim charging infringement of its Van Valkenburg Patent No. 1,890,009, issued December 6, 1932, upon an application filed August 11, 1930. Both of these counterclaims were dismissed on the ground of noninfringement, without any holding as to validity. The defendant appeals in No. 9018 from the judgment dismissing the counterclaim on the Jackson Patent. No appeal has been taken from the judgment dismissing the counterclaim on the Van Valkenburg Patent.

All of the patents in suit are concerned with electric switches employed in the starting of alternating current motors. The trial below was concerned primarily with the question of the validity of plaintiff's patent '149, and most of the attack here is upon the court's finding of invalidity. Plaintiff's reissue patent apparently was considered of minor importance in the court below, as it is here.

We shall first consider plaintiff's appeal (No. 9017) from the judgment holding invalid Patent No. '149 and Reissue Patent No. 20,676. Patent No. '149 discloses a mechanical structure designed to open a circuit and interrupt an electrical current. Its object, so we are informed, was to provide a switch that would have larger capacity than a switch in which the arcs were dispersed in an open hood, as in the prior art. The object allegedly was obtained by impounding the arcs between double-break movable and stationary contacts and actuating the movable contacts by a contact carrier arranged outside the closed hood and having a contact holder passing through an opening into the hood.

The switch is shown in the patent drawing as connected in circuit to start and stop an alternating current motor operated on a three-phase alternating supply circuit. The three-phase current rises and falls between zero current during each half-cycle and re-

336

verses its direction at the end of every half-cycle in passing through zero.

The switch is provided with three poles, one for each phase, in each of which are double-break contacts, stationary contacts and movable contacts, to make and break the circuit between the motor and the supply circuit. The stationary contacts are spaced apart and arranged on terminals connected to the supply circuit. The movable contacts are arranged on a bridge bar carried by a resilient contact holder mounted on a reciprocable contact carrier operated by a magnet and gravity. The double-break movable and stationary contacts in each pole are enclosed in a closed hood, called an arc enclosing chamber in the patent, and are arranged between the terminals to form a magnetic loop by which is created a magnetic field to impound the arcs in the ends of the hood.

The contact holder is provided with a post attached at its bottom to the contact carrier and having stop lugs at its top. The bridge bar is arranged on the post and urged against the stop lugs by a spring interposed between the bridge bar and the cross-bar carrier. The spring is enclosed in a spring shield having a clearance in the opening to leave it free from the hood. The spring shield has to be free in the opening, or otherwise the post would slide through the shield and bridge bar on raising the contact carrier, and the movable contacts would not be raised to engage the stationary contacts.

This switch, so it is stated, operates on a different principle from the prior art in that the magnetic loop impounds the arcs in the ends of the closed hood and the contact holder has free sliding motion in the opening into the closed hood to actuate the movable contacts. There are seven claims of this patent in suit, which may be roughly divided into two classes. Claims 21, 22, 23, 24 and 26 relate to the combination by which the arcs are impounded in the ends of the closed hood while the contact holder has free sliding motion in the opening to actuate the movable contacts. Claim 21, which appears to be typical of this group of claims, has been arranged by plaintiff with its essential elements shown in italics. It is as follows:

"In an electric switch for industrial control service,

"(1) *two spaced stationary contacts (8)*

"(2) *a bar (34) movable with substantially a translating motion toward and from the contacts to electrically bridge the same,*

"(3) *conductors (51) leading to the contacts from a direction opposite to the approach of the bar,*

"(4) *an arc-enclosing chamber (37) enclosing said contacts and bar (34),* said chamber having but a single opening leading thereto,

"(5) *a carrier assembly (20) for moving the bar to and from the contacts and having a part (25) movable through said opening and substantially closing the same,* the internal dimensions of the enclosure being such that its walls lie closely adjacent to the contacts and bar, and the *clearance* between said part which moves through the opening and the walls of the opening being sufficient to facilitate the escape of accumulating gases from within the chamber but close enough to confine the arc within the chamber."

Claims 2 and 20 relate to a combination by which the resilient contact holders are operable through the opening into the closed hood to actuate the movable contacts. Claim 20 may be regarded as typical and likewise has been arranged by plaintiff with its essential elements shown in italics. It is as follows:

"In an electric switch including a plurality of sets of cooperating stationary and movable contacts (8-37), *a plurality of chambers (39) enclosing said sets of contacts and having openings into the interior thereof,* a set of stationary contacts (8) secured to one wall of each of said chambers, a carrier (20), a plurality of movable contact sets (37) carried by said carrier, *resilient means (28) between said carrier (20) and each of said movable contact sets, and shields (31) surrounding said resilient means (28) and movable in said openings for substantially closing the same."*

The court below, after a lengthy trial in which numerous expert witnesses were heard, filed an opinion and made extensive findings of fact upon which its judgment was predicated. While considerable criti-

cism is directed at the lower court's opinion and conclusions, it is evident that it gave careful and painstaking effort to the difficult and complicated problems presented. The court held the patent invalid on numerous grounds. We shall first consider its conclusion that the claims in suit "are invalid for lack of invention in view of the prior state of the art." As to this conclusion, the court in its opinion stated: "The Wilms and Petersen patent does not show an invention. They designed a hood which is completely enclosed except for a single opening in the bottom through which the actuator passes. This is a mere mechanical device permitting the moving of the movable contacts into connection with the fixed contacts. Wilms and Petersen when they designed the hood had no other thought in mind than this."

The court made numerous findings in support of this conclusion, the most pertinent perhaps being findings 6, 9, 10, 24, 25, 26, 29 and 30.

"6. At the time the application for the Wilms and Petersen patents No. 2,071,149 was filed in the Patent Office (July 11, 1935) plaintiff was the owner of Wilms and Dawe patent No. 1,981,534 which disclosed a double-break vertical acting switch having a hood enclosing the contacts which was of practically the same design as the switch described in the Wilms and Petersen patent except that in the Wilms and Dawe patent the hood was formed in one piece with the bottom of the hood left open and the springs which supported the movable contacts were not enclosed in telescoping spring cups."

"9. * * * Plaintiff admitted that the enclosure disclosed in the application was of the same order as in Thomson patent No. 1,375,983 and Ancotti et al. patent No. 1,310,111 cited by the Examiner, but asserted that complete enclosure, if acquired at the expense of accessibility of the contacts, would result in failure. None of the claims in suit refers to accessibility of the contacts."

"10. In addition to the Thomson and Ancotti et al. patents cited by the Examiner, the Wurts patent No. 470,161, Henderson patent No. 777,631, Hewlett patent No. 854,741, Hart patent No. 1,058,178, Leece patent No. 1,817,155, Stanger patent No. 1,465,878, Frasier patent No. 1,106,294, and Apple patent No. 1,856,407 all show electric switches employing complete enclosure of the contacts."

"24. The use of a U-shaped loop in conjunction with the double contact arrangement used in both the Wilms and Petersen and the prior Wilms and Dawe switch tends to cause the two arc columns to spread from each other. This action drives the arc gases against the side walls of the hood and sets up a turbulence in the chamber which increases the rate of deionization of the hot gases and tends to interrupt the arc at the point of current zero."

"25. The cooling effect of the walls of an enclosing hood on the hot gases generated by the arc depends upon the spacing of the walls from the contacts, the area of the walls, and the material from which the hood is made."

"26. The cooling effect of an insulating hood on the hot gases generated by the arc was taught by the prior Wilms and Loock patent No. 1,804,729, the prior Wilms patent No. 1,901,573, and the prior Wilms and Dawe patent No. 1,981,534."

"29. The enclosed hood of the Wilms and Petersen patent does not involve invention over the Wilms and Dawe patent. Adding the bottom wall to the Wilms and Dawe switch, to enclose completely the contacts except for a single opening in the bottom wall through which the actuator passes, is a mere mechanical device permitting the moving of the movable contacts into and out of engagement with the fixed contacts."

"30. A mere opening as such may or may not have a deionizing effect. Wilms and Petersen did not know and consequently did not state the characteristics of an opening which will provide a deionizing effect. They did not invent a device which would effect deionization."

Any standing which plaintiff may have to claim a patentable invention must rest entirely upon the result obtained from a combination of old elements, for admittedly all the elements of the claims in suit were taken from the prior art. More than that, the novelty of the combination is limited to

the cooperating relation between the bottom of the closed hood and the U magnetic loop. At any rate, that is what we glean from plaintiff's brief, which states: "The Wilms and Petersen patent describes and claims, in addition to the elements in the Wilms and Dawe switch, a *bottom* to close the hood cooperating with a U *magnetic loop* through the contacts arranged in a *new functional relation* to separate and impound the arcs from each other in the ends of the closed hood." (Emphasis by plaintiff.)

Or, as stated by plaintiff at another point in its brief:

"The Wilms and Petersen switch embodies in a new functional relation, to the combination in the Wilms and Dawe switch, two additional elements:

"(1) a bottom to extend under the bridge bar and close the hood at the bottom;

"(2) a U magnetic loop through the contacts to impound and compact the ionized arc gas in the closed ends of the closed hood."

With the elements of the combination relied upon thus limited, there is no occasion to discuss in detail the prior art combinations. The court below, as already noted, found that both of the elements relied upon were old and well known and, so far as we are aware, plaintiff makes no attack upon such finding.

Plaintiff, as well as the defendant, prior to the development of the '149 patent, had long been engaged in the manufacture and sale of various types of electric switches; in fact, prior switches developed and used by plaintiff constitute the most pertinent prior art. These patents are No. 1,804,729, issued May 12, 1931, known as the Wilms and Loock switch; No. 1,901,573, issued March 14, 1933, known as the Wilms switch, and No. 1,981,534 issued in 1934, known as the Wilms and Dawe switch.

The Wilms and Loock switch is illustrated as comprising an insulating base carrying a plurality of arms on which the stationary contacts are mounted. Also mounted on the base is an actuating magnet having a movable armature for operating a cross arm of insulating material, which cross arm supports the movable contacts when the magnet is energized the movable contacts engage the stationary contacts to close the circuit, and when the magnet is de-energized the contacts open by gravity. Disposed over the stationary and movable contacts so as "entirely" to enclose each pair of contacts in a separate compartment or chamber which is open only at the bottom, i. e., "only at the point of entrance of the contacts," is a hood formed of suitable refractory insulating material. The hood of this switch provides insulating barriers around each pair of contacts. These barriers form chambers to confine and restrict the arcs which are formed around the contact gaps when the contacts are open under load. Otherwise, so the patent teaches, the arcs would "flash over" or jump directly across between the conducting parts that form the individual poles of the switch. This patent also teaches that "the smaller the area within the compartment surrounding the contacts, the more efficient the suppression of the arc tending to form upon the separation of the contacts," and further it is stated that, with the sides of the compartment in close relation to the contacts, the arc spreads upon the walls and is cooled, the hood dissipating the heat by radiation. This switch was manufactured and sold by plaintiff for years as a Size 1 switch having a continuous current rating of 25 amperes and an interrupting rating sufficient to control a $7\frac{1}{2}$ horsepower motor at 550 volts.

Little need be said of the Wilms patent '573, the mechanical arrangement of which was quite similar to the Wilms and Loock switch except it was suitable for higher ratings. The patent states that the arcs formed upon disengagement of the movable from the stationary contacts are cooled or quenched by the cover member, which has deeper pockets or compartments than the hood of the Wilms and Loock switch, with a two-part construction employed to render the switch contacts readily accessible for inspection and repair. The Wilms and Dawe switch, which was the immediate predecessor of the patent in suit, comprises a solenoid type magnet having a vertically movable core which carries on its upper end an insulating cross bar. This cross bar has a plurality of upstanding posts on its upper surface for supporting movable con-

tacts or bridging bars. Suitable springs surround the posts so that when the cross bar moves upwardly to engage the bridging bars with the stationary contacts the springs will resiliently press the bridging bars against the stationary contacts. This is a conventional type of contact arrangement known in the art as "double-break" because when the two stationary contacts are connected in an electrical circuit, movement of the bridging bar away from the stationary contacts interposes two air gaps or breaks in each line wire or pole.

The stationary contacts in the Wilms and Dawe switch are carried on an insulating hood which is shaped to provide individual chambers or compartments for each set of contacts, and the Wilms and Dawe Reissue Patent (No. 90,094) states that these chambers afford the same arc quenching effect as the hood of the Wilms and Loock patent.

Just as the switch of the Wilms patent '573 was designed to handle larger currents than the Wilms and Loock switch, so the switch of the patent in suit was designed to handle larger currents than the Wilms and Dawe switch. Relative to the claims in suit, the changes consisted only of (1) enlarging the parts, (2) adding to the Wilms and Dawe hood a bottom wall having the necessary opening therein to permit operation of the contacts, and (3) enclosing the contact springs of the Wilms and Dawe switch in a shield or guard. Changes (1) and (2) are reflected in claims 21 to 24, inclusive, and 26, and change (3) in claims 2 and 20.

Thus the switch of the patent in suit utilizes the same magnet and the same movable contact structure as the Wilms and Dawe switch, except that a pair of telescoping cups encloses each of the contact springs in the switch. The stationary contacts are mounted on the top wall of the contact-enclosing chambers, just as the Wilms and Dawe switch, but the contact-enclosing chambers differ from the integral block construction of the Wilms and Dawe switch in that the chambers are provided with bottom walls for increasing the degree of enclosure. A sectional construction is therefore necessarily employed to provide for access to the contacts. In this switch a top block which carries the station-

ary contacts, a front block and a back block are provided, the three blocks cooperating to form individual chambers for each set of contacts. The bottom wall of each chamber is provided with a hole to receive the telescoping cups of the movable contact structure.

So far as we are able to discern, the Wilms and Dawe switch shows every mechanical and electrical element of the '149 switch, as defined in claims 21 to 24, inclusive, and 26, save that in the latter there has been substituted for the open bottom housing of Wilms and Dawe a box or housing having a bottom wall in which an opening was placed to admit the Wilms and Dawe movable contact actuating mechanism.

As already noted, the court found that the magnetic loop feature as well as the enclosed hood were old. This is not open to dispute. More than that, with the hood open at the bottom, the arcs separated and spent their energy against the side walls. This result was described by Wilms and Dawe as "an arc quenching effect." Assuming what is claimed that the arcs are more securely impounded and more rapidly extinguished in an enclosed hood, in other words that a better result was obtained, the question arises as to whether the means employed to obtain that improved result—the enclosure of the hood at the bottom—was of such an ingenious nature as to amount to invention. We agree with the lower court that it was not. We should think that it would hardly require the skill of a mechanic to appreciate that an element so elusive as an electric arc could be more readily and firmly impounded in a hood enclosed on all sides than in one open at the bottom.

Wilms, one of the co-patentees, wrote an article entitled "Development of a Solenoid Starting Switch," published in "Electrical Manufacturing," issue of October 1935, which while interesting and informative, rather clearly discloses that the patentee at that time failed to recognize the novel features which are now claimed as invention. In fact, the article, while quite laudatory of the new switch, is directed almost entirely at two features, (1) the compactness of the switch, and (2) its section-

alized construction which enabled a mechanic readily to obtain admission for service or repair by the removal of a section. Illustrative of the advantages claimed for the new switch is the following statement: "With the new switch design, where the arc has been confined within the physical dimensions of the switch proper, it was possible to mount those switches much closer together, thus reducing the size of larger control equipment, making it possible to build the control into the machine direct, and providing a much simpler arrangement."

The author-patentee in a concluding paragraph stated: "From the test results obtained, and from reports filtering in from industrial users, it is evident that the reduced size of the Bulletin 709 starter has not been purchased at the expense of reliability and performance. On the contrary, as these tests show, performance and reliability have been actually improved. The starter's reduced size, its increased reliability, its added flexibility, have been the result of improved design."

Wilms at the trial was cross-examined concerning the article to which we have referred, and a few of the questions and answers pertaining thereto are significant. He testified as follows:

"Q. Now, I would like to ask you to please look through this article carefully and see if you can find any statement which applies to the Wilms and Petersen structure, that is, the Size 2 Allen-Bradley Bulletin 709 starter, which does not apply to the Wilms and Dawe Size 1 solenoid 709 starter. Do you know of any? A. No, I don't know of any.

"Q. And it is true, is it not, that as far as fundamental features of across-the-line switches are concerned they are all the same in the Wilms and Dawe and Wilms and Petersen switches? A. Yes.

"Q. And that is the reason, is it not, that you make the statement under illustrations on page 64 of the Size 1 and Size 3 starter which statement reads as follows: 'Minor differences are superficial for same principles have been applied in each'? Is that correct? A. Yes, sir.

"Q. And I am correct, am I not, that the Size 2 and 3 starters are the Wilms and Petersen starters? A. Absolutely, Wilms and Petersen starters, yes.

"Q. And they are just alike except for the size? A. Just alike except in size.

"Q. Except for size? A. For size."

Plaintiff's switch was placed on the market in August 1934, although the application for the '149 patent was not filed until July 11, 1935. After having had the opportunity to become familiar with the operation of the switch, patentees pointed out in their application that the purpose was to apply the operating principle of the Wilms and Dawe switch to larger motors with an increased capacity. They stated: " * * * Past experience dictated complete enclosure of the contacts to effect this end, but the need for accessibility of the contacts was paramount, and at one stroke eliminated all past constructions from consideration. While complete and total enclosure of the contacts was needed, if acquired at the expense of accessibility, the switch would be a failure."

At that time plaintiff admitted that complete enclosure of the contacts was known and was dictated by past experience. Specifically plaintiff admitted that " * * * Ancotti [No. 1,310,111] and Thomson [No. 1,375,983] anticipate * * * the broad idea of enclosing the contacts for arc suppression." It thus clearly appears that plaintiff's theory of patentability, advanced when it sought to obtain patent protection on the '149 switch, was predicated upon accessibility of the contacts. As the court found, however, none of the claims in suit relate or refer to this element which the patentees originally considered as vital.

After considerable maneuvering in the patent office certain claims, including those in suit, were allowed, on what theory is not readily discernible in view of the concession as to the state of the art. The most generous appraisal which we are able to accord to this claimed invention is that the hood was enclosed in such a way as to affect the arcs in a manner that would enable the switch to carry a heavier load. In this there was nothing novel, either in the principle or the result. It was an ex-

tended application of prior art teachings, "a change only in form, proportions, or degree, the substitution of equivalents doing substantially the same thing in the same way by substantially the same means," and is not such invention as would sustain a patent. Smith v. Nichols, 21 Wall. 112, 88 U.S. 112, 119, 22 L.Ed. 566; Schreyer v. Chicago Motocoil Corp., 7 Cir., 118 F.2d 852, 855. The complete enclosure of the hood could hardly be classified as a patentable invention even though it had not been disclosed in the prior art. See Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163. Likewise, enlarging the proportions and size of the hood and parts of the prior Wilms and Dawe switch to provide for increased capacity could hardly be classified as the exercise of the inventive faculty. Planing-Machine Co. v. Keith, 101 U.S. 479, 25 L.Ed. 939. The improvement of the Wilms and Dawe switch by substituting for its open bottom housing a more complete enclosure or barrier in the form of a box, was not patentable because it was not the result of invention but the mere exercise of the skill of the calling and an advance plainly indicated by the prior art. Electric Cable Co. v. Brooklyn Edison Co., Inc., 292 U.S. 69, 79, 80, 54 S.Ct. 586, 78 L.Ed. 1131; Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005.

Claims 2 and 20, as already shown, and as admitted by plaintiff, are directed to "the mechanical arrangement," by providing for telescoping cups enclosing the contact springs in the switch. Thus the conceptual novelty of these claims resides in the use of a shield or guard for protecting the contact spring from being overheated by the hot gases produced during arcing without interfering with the action of the spring. Such a protective device was likewise old in the art. Bruehl Patent No. 1,764,196. Irrespective of the prior art, however, we would think, when confronted with this situation, that a skilled mechanic might readily foresee the desirability of providing a shield or guard to protect the contact spring from the increased heat and gases occasioned by an enclosed hood.

The court below also concluded that patent '149 was invalid for the reason that the specification thereof is indefinite and contravenes the provision of R.S. § 4888, 35 U.S.C.A. § 33, and that the claims in suit are invalid because they fail particularly to point out and distinctly prove the part, improvement or combination which the patentee claims as his invention or discovery. Inasmuch as we agree with the conclusion that the claims are invalid for lack of invention in view of the prior state of the art, we find it unnecessary to consider these other grounds which the court utilized as a basis for its judgment invalidating the patent.

Little need be said concerning the reissue patent in suit, No. 20,676. It is based on the same switch as shown in the main patent already considered. The plaintiff sought to withdraw this patent from suit before the court rendered an opinion on the main patent, but the defendant insisted upon an adjudication. The court declared the reissue patent invalid on the Wilms and Dawe patent, which has already been considered in reference to the main patent. The plaintiff has withdrawn from suit on this appeal claims 2, 4 and 5 of this reissue patent, and relies only on claim 1. Here, the claimed invention purports to lie in the use of a metal base plate for supporting the box or housing of the '149 patent and the operating magnet in alignment, and in the consequent elimination of the bulky insulating or slate bases used in some prior types of switches. We think there is little room for controversy but that the use of these metal plates in identical fashion and for identical purposes was not only old in the prior patent art, including the Wilms and Dawe patent, but has been standard practice with the defendant for many years prior to the issuance of any of the patents in suit. We also agree with the conclusion of the lower court that this reissue patent is invalid.

As heretofore noted, defendant filed a counterclaim charging the plaintiff with infringement of defendant's patent No. 2,143,697. The court below held against the defendant on its charge of infringement and dismissed its counterclaim for

want of equity. Defendant's cross-appeal brings here the lower court's holding of non-infringement. The defendant in its brief states: "Defendant prevailed in the court below on the main complaint and, absent an appeal by plaintiff, would not have prosecuted this cross-appeal. The counterclaim was, and this cross-appeal is, 'a shield and not a sword.'"

Furthermore, counsel for the defendant stated during oral argument that there was no objection to an affirmance of the judgment involved in this cross-appeal, provided the judgment in appeal No. 9017 was affirmed. Inasmuch as we have affirmed the judgment in No. 9017, and in view of the statements made by counsel for the defendant in its brief and during oral argument, there appears no reason for a consideration of the cross-appeal on its merits.

The judgment is affirmed as to both appeals.